1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ILLUMINA INC., et al.,

Plaintiffs,

v.

BGI GENOMICS CO., LTD., et al.,

Defendants.

Case No.  20-cv-01465-WHO

**CLAIM CONSTRUCTION**

**INTRODUCTION**

In this matter, plaintiffs Illumina Inc. and Illumina Cambridge Ltd. (collectively, "Illumina") assert infringement claims against defendants BGI Genomics Co., Ltd., BGI Americas Corp., MGI Tech Co., Ltd., MGI Americas, Inc., and Complete Genomics Inc. (collectively "BGI"). The parties request construction of five terms from three patents asserted by Illumina, all of which relate to sequencing of nucleic acids. My constructions are below.

**BACKGROUND**

**I.     PROCEDURAL BACKGROUND**

BGI and Illumina are competitors in the field of genomic sequencing. This matter, ("*Illumina II*") is related to *Illumina Inc., et al., v. BGI Genomics Co., Ltd.*, et al., Case No. 19-cv-3770 (N.D. Cal.) ("*Illumina I*"). Illumina filed the complaint in *Illumina I* on June 27, 2019. *Illumina I*,[1] Dkt. No. 1. In that matter Illumina alleges that BGI infringes U.S. patent number 9,410,200 (the "'200 patent") and U.S. patent number 7,566,537 (the "'537 patent") by selling its sequencers and related reagents (collectively, "standardMPS"). *Id.* ¶¶ 2, 33-44.

---

[1] References to docket numbers are to the docket in this matter, *Illumina II*, unless otherwise noted.

Illumina filed the complaint in the present case, *Illumina II* on February 27, 2020, after it learned of a new product developed by BGI called CoolMPS™ ("CoolMPS").  Dkt. No. 1.  In this lawsuit, Illumina asserts infringement of U.S. Patent numbers 7,771,973 (the "'973 patent"), 7,541,444 (the "'444 patent"), and 10,480,025 (the "'025 patent").  *Id.* ¶ 2. The '973, '444, and '537 patents claim priority to or are a divisional of the same patent application.  *Id.* ¶ 38.  Illumina claims BGI's CoolMPS products, which are purportedly based upon new sequencing chemistry, infringe claim 13 of the '973 patent, claim 3 of the '444 patent, and claim 1 of the '025 patent.  *Id.* ¶¶ 48, 65, 146, 232.

## II.      FACTUAL BACKGROUND

Illumina is a market leader in the field of sequencing deoxyribonucleic acid ("DNA"), and specifically in a method known as sequencing-by-synthesis ("SBS").  *Illumina I*, Dkt. No. 1 ("Compl.") ¶¶ 1, 36.  DNA is comprised of molecules called nucleotides, which consist of a sugar molecule and a phosphate molecule that form the backbone of each DNA strand, and a chemical base, which binds with a complementary chemical base in the other strand.  Dkt. No. 184 at 3.  The chemical base may be one of four molecules: adenine, guanine, cytosine, and thymine.  *Id.* at 2-3.  Each one of these molecules binds or pairs with only one other molecule; for example, guanine only pairs with cytosine and adenine only pairs with thymine.  *Id.* at 3.

SBS uses this basic complementary pairing principle in order to sequence unknown DNA molecules.  *Id.* at 3.  It is possible to determine the sequence of one strand of a DNA molecule to be sequenced, often called target DNA, by identifying the sequence of the complementary nucleotides that bind with it.  *Id.*  In SBS, nucleotides are "incorporated" or bound to the target DNA strand and "read" one by one.  *Id.* at 6.  In other words, nucleotides are added one at a time to bind with a complementary nucleotide base in the target DNA strand, and each time a nucleotide is added it is identified as adenine, guanine, cytosine, or thymine.  *Id.* at 3-6.  In this way, it is possible to determine the sequence of the target DNA strand.

Illumina's patents specify several aspects of SBS, and in particular the method of adding nucleotides one at a time so that each one can be read before another nucleotide is added.  *Id.* at 6-7.  The nucleotides that are added to the growing sequence to identify the target DNA strand are part of

United States District Court
Northern District of California

Illumina's patented technology and the subject of some of the claims at issue.  *Id.*

**A.     '444 Patent**

The '444 patent shares a specification with the '973 patent and is titled "Modified

Nucleotides."  *See* Dkt. No. 1-2 ("'444 patent").  Claim 1 of the '444 patent provides for "[a] modified

nucleotide molecule comprising a purine or pyrimidine base and a ribose or deoxyribose sugar moiety

having a removable 3′-OH blocking group covalently attached thereto, such that the 3′ carbon atom has

attached a group of the structure —O—Z wherein Z is any of" five enumerated structures.  Dkt. No. 1-

2 ("'444 patent") 85:65-86:36.  It further states:

—O-Z

wherein Z is any of —$C(R^{IV})_2$—O—R", —$C(R')_2$—N(R")$_2$, —$C(R')_2$—N(H)R", —$C(R^{IV})_2$—S—R" and —$C(R')_2$—N$_3$,

wherein —$C(R^{IV})_2$—O—R" is of the formula —$CR^4$($R^5$)—O—$CR^4$($R^5$)—$OR^6$ or of the formula —$CR^4$($R^5$)—O—$CR^4$($R^5$)—$SR^6$; and wherein —$C(R^{IV})_2$—S—R" is of the formula —$CR^4$($R^5$)—S—$CR^4$($R^5$)—$OR^6$ or of the formula —$CR^4$($R^5$)—S—$CR^4$($R^5$)—$SR^6$;

wherein each R" is or is part of a removable protecting group;

each R' is independently a hydrogen atom, an alkyl, substituted alkyl, arylalkyl, alkenyl, alkynyl, aryl, heteroaryl, heterocyclic, acyl, cyano, alkoxy, aryloxy, heteroaryloxy or amido group, or a detectable label attached through a linking group; or (R')$_2$ represents an alkylidene group of formula ═$C(R''')_2$ wherein each R''' may be the same or different and is selected from the group comprising hydrogen and halogen atoms and alkyl groups;

each $R^4$ and $R^5$ is independently a hydrogen atom or an alkyl group;

$R^6$ is alkyl, cycloalkyl, alkenyl, cycloalkenyl or benzyl; and

wherein said molecule may be reacted to yield an intermediate in which each R" is exchanged for H, which intermediate dissociates under aqueous conditions to afford a molecule with a free 3'OH; with the proviso that where Z is —$C(R^{IV})_2$—S—R", both $R^{IV}$ groups are not H.

*Id.* at 86:4-35.  Claim 3 states, in its entirety, "[a] molecule according to claim 1 wherein Z is an

azidomethyl group."  *Id.* 86:39-40.

United States District Court
Northern District of California

**B.      '973 Patent**

The '973 patent is a continuation of the '444 patent and shares a specification with the '444 patent.  *See* Dkt. No. 1-1 ("'973 patent").  Claim 1 of the '973 patent claims "A method for determining the sequence of a target single-stranded polynucleotide, comprising monitoring the sequential incorporation of complementary nucleotides wherein at least one incorporation is of a nucleotide having a removable 3' – OH blocking group covalently attached thereto, such that the 3' carbon atom has attached a group of the structure –O—Z."  *Id.* at 86:24-32.  It further states:

> —O—Z
>
> wherein Z is any of allyl, —C(R')$_2$—N$_3$, —C(R$^{IV}$)$_2$—O—R", —C(R')$_2$—N(R")$_2$, —C(R')$_2$—N(H)R", or —C(R$^{IV}$)$_2$—S—R",
> wherein —C(R$^{IV}$)$_2$—O—R" is of the formula —CR$^4$(R$^5$)—O—CR$^4$(R$^5$)—OR$^6$ or of the formula —CR$^4$(R$^5$)—O—CR$^4$(R$^5$)—SR$^6$; and wherein —C(R$^{IV}$)$_2$—S—R" is of the formula —CR$^4$(R$^5$)—S—CR$^4$(R$^5$)—OR$^6$ or of the formula —CR$^4$(R$^5$)—S—CR$^4$(R$^5$)—SR$^6$;
> each R" is or is part of a removable protecting group;
> each R' is independently a hydrogen atom, an alkyl, substituted alkyl, arylalkyl, alkenyl, alkynyl, aryl, heteroaryl, heterocyclic, acyl, cyano, alkoxy, aryloxy, heteroaryloxy or amido group, or a detectable label attached through a linking group; or (R')$_2$ represents an alkylidene group of formula =C(R''')$_2$ wherein each R''' may be the same or different and is selected from the group comprising hydrogen and halogen atoms and alkyl groups;
> each R$^4$ and R$^5$ is independently a hydrogen atom or an alkyl group; and
> R$^6$ is alkyl, cycloalkyl, alkenyl, cycloalkenyl or benzyl, and wherein the blocking group is removed prior to introduction of the next complementary nucleotide.

*Id.* 86:32-56.  Claim 13 of the '973 patent states in full "The method of claim 1 wherein Z is an azidomethyl group."  *Id.* at 88:37-38.

**C.      '025 Patent**

The '025 patent shares a specification with the '537 and '200 patents asserted in *Illumina I*, and is titled "Labeled Nucleotides."  *See* Dkt. No. 1-3 ("'025 patent").  Claim 1 of the '025 patent claims "A nucleotide or nucleoside molecule having a ribose or deoxyribose sugar moiety and a base linked to a detectable label via a cleavable linker, wherein the sugar moiety comprises a protecting group attached via a 3' oxygen atom, and wherein said protecting group comprises an

4

United States District Court
Northern District of California

azido group that can be modified or removed to expose a 3' OH group." *Id.* at 21:19-24.

## LEGAL STANDARD

Claim construction is a matter of law.  *See Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996); *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). "Generally, a claim term is given its ordinary and customary meaning—the meaning that a term would have to a person of ordinary skill in the art in question at the time of the invention." *Howmedica Osteonics Corp. v. Zimmer, Inc.*, 822 F.3d 1312, 1320 (Fed. Cir. 2016) (internal quotation marks and citation omitted).  In determining the proper construction of a claim, a court begins with the intrinsic evidence of record, consisting of the claim language, the patent specification, and, if in evidence, the prosecution history.  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005); *see also Vitronics*, 90 F.3d at 1582.  "A claim term used in multiple claims should be construed consistently . . . ."  *Inverness Med. Switzerland GmbH v. Princeton Biomeditech Corp.*, 309 F.3d 1365, 1371 (Fed. Cir. 2002).

"The appropriate starting point . . . is always with the language of the asserted claim itself." *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1186 (Fed. Cir. 1998).  "[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Phillips*, 415 F.3d at 1312.  "There are only two exceptions to this general rule: 1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of a claim term either in the specification or during prosecution." *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012). Such redefinition or disavowal need not be express to be clear.  *Trustees of Columbia Univ. in City of New York v. Symantec Corp.*, 811 F.3d 1359, 1364 (Fed. Cir. 2016).

Like a person of ordinary skill in the art, courts read terms in the context of the claim and of the entire patent, including the specification.  *Phillips*, 415 F.3d at 1313.  The specification is "the single best guide to the meaning of a disputed term." *Vitronics*, 90 F.3d at 1582.  "The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Renishaw PLC v.*

United States District Court
Northern District of California

5

*Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998).  The court may also consider the prosecution history of the patent, if in evidence.  *Markman*, 52 F.3d at 980.  The prosecution history may "inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be."  *Phillips*, 415 F.3d at 1317 (citing *Vitronics*, 90 F.3d at 1582-83); *see also Chimie v. PPG Indus., Inc.*, 402 F.3d 1371, 1384 (Fed. Cir. 2005) ("The purpose of consulting the prosecution history in construing a claim is to exclude any interpretation that was disclaimed during prosecution.") (internal quotations omitted).

In most situations, analysis of this intrinsic evidence alone will resolve claim construction disputes, *Vitronics*, 90 F.3d at 1583; however, a court can further consult "trustworthy extrinsic evidence" to compare its construction to "widely held understandings in the pertinent technical field," *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1309 (Fed. Cir. 1999). Extrinsic evidence "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises."  *Markman*, 52 F.3d at 980.  All extrinsic evidence should be evaluated in light of the intrinsic evidence, *Phillips*, 415 F.3d at 1319, and courts should not rely on extrinsic evidence in claim construction to contradict the meaning of claims discernible from examination of the claims, the written description, and the prosecution history, *Pitney Bowes*, 182 F.3d at 1308 (citing *Vitronics*, 90 F.3d at 1583).

## DISCUSSION

A.   "wherein the blocking group is removed prior to introduction of the next complementary nucleotide"

| Patent/Term | Illumina's Proposal | BGI's Proposal |
|---|---|---|
| **"wherein the blocking group is removed prior to introduction of the next complementary nucleotide"**<br><br>'973 Patent: claim 1, 13 | wherein the blocking group is removed before the next complementary nucleotide is incorporated into a growing nucleotide strand complementary to the target single-stranded polynucleotide being sequenced | wherein the blocking group must be removed before putting or placing complementary nucleotides into the mixture that contains the target and growing polynucleotide chains |

United States District Court
Northern District of California

1    The parties dispute the proper construction of the term "wherein the blocking group is

2  removed prior to introduction of the next complementary nucleotide."  The parties' briefing

3  largely rehashes arguments raised during briefing on Illumina's preliminary injunction motions

4  that I previously discussed in my order in *Illumina I*, granting Illumina's motions.  *See Illumina I*,

5  Dkt. No. 185 ("PI Order") at 5-7.  Consistent with my PI Order, I conclude that BGI's proposed

6  construction in this case "would import a limitation into the patent claim that is not supported by

7  anything in the patent specification."  *Id.* at 6.  In contrast, Illumina's proposed construction

8  accurately captures how a person of ordinary skill in the art at the time of the invention would

9  have understood the disputed claim.

10    The parties' dispute turns primarily on the meaning of the word "introduction" in claim 1

11  of the '973 patent.  Illumina argues that "introduction" is used largely interchangeably with the

12  word "incorporation" in the claim and that here it refers to a complementary nucleotide being

13  "incorporated into a growing nucleotide strand."  Dkt. No. 184 at 8.  BGI, in contrast, argues that,

14  because the words "incorporation" and "introduction" are different, they are presumed to have

15  different meanings under patent law and that "introduction," in this case, refers to adding

16  complementary nucleotides to a reaction mixture.  Dkt. No. 191, BGI Responsive Claim

17  Construction Brief ("BGI Resp.") at 15.

18    As explained in my PI Order, although different patent terms are presumed to have

19  different meanings, review of the patent claims and specification here reveal that, in claim 1 of the

20  '973 patent, the term "introduction" of nucleotides is used "in a way very similar to, if not

21  interchangeably with the word 'incorporation.'"  PI Order at 6.  Review of the claim language and

22  specification reveal that Illumina's proposed construction, not BGI's, reflects how a person of

23  ordinary skill in the art would understand the term.

24    "The focus of the patent is on the use of a blocking group to prevent
new nucleotides from binding. There is no significance in the patent

25    in introducing new nucleotides before or after removal of the blocking
group. The patent does not describe precisely when the blocking

26    group should be removed or that removal must occur before
'introduction' (in addition to before incorporation) of new

27    nucleotides. Instead, the claimed invention focuses on removal of the
blocking group after the nucleotide is read, so that a new nucleotide

28    may then [be] incorporated to the strand and read in turn."

7

1   PI Order at 5-6 (internal citation omitted).  Given the focus of the patent, the term "introduction"

2   in claim 1 appears to refer to a complementary nucleotide being "incorporated into a growing

3   nucleotide strand," not to nucleotides being added to a reaction mixture.  *See Phillips*, 415 F.3d at

4   1316 ("The construction that stays true to the claim language and most naturally aligns with the

5   patent's description of the invention will be, in the end, the correct construction.") (citation

6   omitted).

7           BGI argues that the claimed method involves a separate discrete step of bringing

8   nucleotides in contact with the target strand by adding nucleotides to the reaction mixture, a

9   process described in the patent specification.  Dkt. No. 191 at 15.  It asserts that "introduction," as

10  used in claim 1, refers to this separate step.  *Id.*  But as explained in my PI Order, "[t]his portion of

11  the specification, which is also the subject of a separate claim in the patent, does not use the term

12  'introduction' but instead states that nucleotides are 'brought into contact with the target.'"  PI

13  Order at 6 (citing '973 patent 6:19-24, 88:1-12).  Although the specification does detail a two-step

14  process of first adding nucleotides to a reaction mixture and then removing non-incorporated

15  nucleotides prior to detection, it does not necessarily follow that claim 1 is directed to this process.

16  Indeed, the patent includes several claims that clearly reference this process, all of which repeat

17  the phrase "brought into contact with the target" and make clear that the method described

18  includes "a first step and a second step."  *See* '973 88:1-36.  Claim 1, in contrast, makes no

19  reference to these two steps and does not use the phrase "brought into contact."  *See* '973 patent at

20  86:24-56.

21          BGI's remaining arguments are no more persuasive.  BGI argues that the common

22  dictionary definition of "introduction" -- "to put something or someone in a place among or

23  between other things or persons" --  is consistent with its proposed construction in which

24  "introduced" refers to adding nucleotides to a reaction mixture.  Dkt. No. 191 at 17.  But this

25  definition is also consistent with Illumina's proposed construction, in which "introduced" refers to

26  incorporating a complementary nucleotide into a growing strand.  BGI also takes issue with

27  Illumina's citation to a sentence in the specification that uses the phrase "the incorporation of said

28  molecule preventing or blocking introduction of subsequent nucleoside or nucleotide molecules

United States District Court
Northern District of California

8

United States District Court
Northern District of California

into said growing complementary polynucleotide," arguing that Illumina "offers no reasons why a person of ordinary skill would focus on this particular sentence to the exclusion of everything else in the rest of the disclosure." Dkt. No. 191 at 17.  But as noted in my PI Order, this passage provides an example of the term "introduction" being used "in a way very similar to, if not interchangeably with, the word 'incorporation.'"  PI Order at 6.  In contrast, BGI does not identify any use of the word "introduction" in the patent suggesting that it is meant to be used interchangeably with the phrase "brought into contact," as it proposes.  Further, BGI's citation to the deposition of Dr. Xiaohai Liu does not confirm its proposed construction.  Dr. Liu's testimony acknowledges that nucleotides must be brought into contact with a reaction mixture before they can be incorporated into a growing strand, but does not indicate that claim 1's use of the term "introduction" refers to this step.  *See* (Dkt. No. 191-6) Milowic Decl., Ex. E at 211:13-212:17, 222:13-225:23.

Finally, BGI's argument that the step of removing the blocking group must occur before the step of adding new nucleotides to the reaction mixture fails because, for the reasons outlined above, I have concluded that the term "introduction of the next complementary nucleotide" refers to the incorporation of a complementary nucleotide into the growing strand, not to the addition of nucleotides to the reaction mixture. As a result, claim 1 does not appear to include any step or requirement related to the timing of the addition of nucleotides to the reaction mixture.

For these reasons, I adopt Illumina's proposed construction.

**B.**     **"monitoring the sequential incorporation of complementary nucleotides"**

| Patent/Term | Illumina's Proposal | BGI's Proposal |
|---|---|---|
| **"monitoring the sequential incorporation of complementary nucleotides"**<br><br>'973 Patent: claim 1, 13 | No construction necessary. | sequentially incorporating labeled nucleotides and monitoring their incorporation over multiple cycles in a sequencing by synthesis reaction |

BGI argues that the term "monitoring the sequential incorporation of complementary nucleotides" should be construed as "sequentially incorporating labeled nucleotides and

9

United States District Court
Northern District of California

1    monitoring their incorporation over multiple cycles in a sequencing by synthesis reaction."  Dkt.

2    No. 191 at 10.  Illumina argues that BGI's proposed construction inappropriately creates two

3    limitations not included in the claim language: (1) that labeled nucleotides must be used; and (2)

4    that the labeling must occur prior to incorporation.  Dkt. No. 184 at 13.  Illumina further argues

5    that the language "over multiple cycles in a sequencing by synthesis reaction" is ambiguous and

6    unnecessary.

7                   **1.**      **"labeled nucleotides"**

8          BGI argues that this term should be construed to require the use of "labeled nucleotides"

9    arguing that this limitation is "at the heart of" the '973 patent's invention and can therefore be read

10   into the claims.  *See* Dkt. No. 191 at 10-11.  BGI's primary support for its position is that in the

11   preferred embodiment of the '973 patent, labeled nucleotides are used to detect the type of

12   nucleotide incorporated into the growing sequence.  *See id.*   BGI also notes that the specification

13   repeatedly references the use of labels and of detecting labels and asserts that, as a result, "the use

14   of labeled nucleotides is more than a preferred embodiment.  Labeled nucleotides are central to the

15   performance of the claimed sequencing by synthesis method."  Dkt. No. 191 at 12.  It argues that

16   it is therefore appropriate to read its proposed "labeled nucleotide" limitation into the claims.

17         While the Federal Circuit "has narrowly construed claim terms in light of the preferred

18   embodiment when the patent has described the preferred embodiment as the invention itself,"

19   *SunRace Roots Enter. Co. v. SRAM Corp.*, 336 F.3d  1298, 1305 (Fed. Cir. 2003), here review of

20   the specification and the preferred embodiment do not indicate that the use of labeled nucleotides

21   is fairly characterized as the invention itself, as BGI contends.  As noted in my PI Order, and

22   above, "[t]he focus of the patent is on the use of a blocking group to prevent new nucleotides from

23   binding."  PI Order at 5.  While the claimed method involves detecting the type of nucleotide

24   incorporated into the growing strand, the precise means of detecting the nucleotide type is not the

25   focus of the invention.  This is reflected in the disputed language of claim 1, which does not

26   specify a particular method for detecting the nucleotide type and instead states only that the

27   method comprises "monitoring the sequential incorporation of complementary nucleotides."  '973

28   patent at 86:25-26.  While BGI has demonstrated that "labeled nucleotides" are used in the

patent's preferred embodiment, this alone cannot justify reading a limitation into the claims. *See*

*MasterMine Software, Inc. v. Microsoft Corp.*, 874 F.3d 1307, 1310 (Fed. Cir. 2017) ("[W]hile we

read claims in view of the specification, of which they are a part, we do not read limitations from

the embodiments in the specification into the claims."); *SRI Intern v. Matsushita Elec. Corp. of*

*America*, 775 F.2d 1107, 1121 n.14 (Fed. Cir. 1985) ("That a specification describes only one

embodiment does not require that each claim be limited to that one embodiment"). And, while it

is true that the use of labeled nucleotides is a necessary part of the preferred embodiment because

it fulfills the required monitoring or detection step, this does not preclude the use of some other

process to detect the nucleotide type instead. The patent specification and claim language do not

support BGI's position that the use of "labeled nucleotides" can fairly be described as "the

invention itself" and do not justify reading this limitation into the claims.

Review of the claim language, which BGI also points to, only supports this conclusion.

BGI argues that the patent claim language indicates that a "labeled nucleotide" must be used

because claim 1 "recites that the label can be attached to the R' moiety of the blocking group,

which is an embodiment described in the specification" while "claim 2 recites that the label is

attached to the base, another embodiment in the specification" and that "in all cases, there is a

label attached to the nucleotide before incorporation." Dkt. No. 191 at 13. However, claim 1 does

not require a label to be attached to the R' moiety of the blocking group – rather a detectable label

is listed as one of several alternative options for R'. *See* '973 patent at 86:43-46. Dependent

claim 2 does specifically require that the nucleotide "comprises a base linked to a detectable

label," but this primarily highlights that there is no specific labeling requirement in claim 1.

Indeed, as Illumina points out, given the "presumption that distinct claims, particularly an

independent claim and its dependent claim, have different scopes," *see World Class Tech. Corp. v.*

*Ormco Corp.*, 769 F.3d 1120, 1125 (Fed. Cir. 2014), claim 2's specific detectable label

requirement reaffirms the idea that claim 1 does not include such a limitation.

The parties dedicate much of their briefing on this term to arguing over whether the '973

patent discloses examples of detecting the nucleotide type through methods besides labeled

nucleotides. Ultimately, I conclude that this discussion does not matter. The parties generally

11

seem to agree that there are other methods for detecting a nucleotide type that do not involve the use of labeled nucleotides and that these would have been known to a person of skill in the art at the time of the invention.  There is also no meaningful dispute that none of these methods are specifically disclosed in the embodiments of the patent.  In sum, the parties' arguments back in forth on these points do not meaningfully move the needle.  The primary issue remains whether the "labeled nucleotide" limitation disclosed in the patent's embodiments should be imported to the claims.  For the reasons discussed above, I conclude that such a limitation is not appropriate.

### 2.   "over multiple cycles in a sequencing by synthesis reaction"

Illumina opposes adding the phrase "over multiple cycles in a sequencing by synthesis reaction," asserting that the phrase introduces further terms without providing any additional clarification and would likely only serve to confuse a jury.  Dkt. No. 184 at 16.  BGI argues that there is no meaningful dispute that the term refers to the sequential incorporation of nucleotides over multiple cycles in a sequencing by synthesis reaction and that this proposed construction should be adopted as undisputed.  Dkt. No. 191 at 10.  In its reply, Illumina responds that the phrase "sequencing by synthesis" is ambiguous, that BGI's expert has said the phrase is ambiguous, and that BGI's expert has not been able to coherently explain what it is supposed to add to BGI's construction.  Dkt. No. 195 at 5.  In its sur-reply, BGI argues that its expert, Metzker, explained that he understands the term sequencing by synthesis, in this context, to refer to the "cyclic reversible termination" method recited in the claims.  Dkt. No. 199 at 4.

I agree with Illumina that adding the proposed language is unnecessary and potentially confusing.  BGI does not make a strong argument why this additional language is needed.  And, while it appears that there is no real dispute between the parties that the '973 patent claims a method that involves a sequencing by synthesis reaction, the parties also seem to agree that the term sequencing by synthesis is generally "ambiguous" and can mean different things in different contexts.  It does not appear that adding this language is likely to clarify the meaning of the relevant term and could potentially introduce additional and unnecessary ambiguity.

For the reasons discussed above, I conclude that no construction is necessary for the term "monitoring the sequential incorporation of complementary nucleotides."

United States District Court
Northern District of California

United States District Court
Northern District of California

### C.   "wherein at least one incorporation is of a nucleotide having a removable 3' – OH blocking group covalently attached thereto"

| Patent/Term | Illumina's Proposal | BGI's Proposal |
|---|---|---|
| **"wherein at least one incorporation is of a nucleotide having a removable 3' – OH blocking group covalently attached thereto"**<br><br>'973 Patent: claim 1, 13 | No construction necessary. | indefinite |

BGI argues that the term "wherein at least one incorporation is of a nucleotide having a removable 3' – OH blocking group covalently attached thereto" is indefinite.  Dkt. No. 191 at 20. It contends that the phrase "at least one" appears to mean "one or more" but argues that this does not make sense within the context of the claimed method, because the claimed method only works if *all* of the incorporated nucleotides have a removable blocking group.  *Id.* Illumina argues that BGI's indefiniteness claim is improper because BGI failed to disclose it in its invalidity contentions, as required under the local patent rules.  Dkt. No. 184 at 16.  If I consider the argument, it further argues that the term is not indefinite because it is straightforward and nothing about it would "fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention."  Dkt. No. 184 at 19 (quoting *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014).  For the reasons discussed below, I conclude that BGI's indefiniteness challenge with regard to this term is improper and, even if considered, fails on the merits.

#### 1.   Compliance With Patent Local Rules

Illumina asserts that I should disregard BGI's indefiniteness challenge with respect to this term because BGI failed to disclose it in its invalidity contentions, as required by Local Patent Rule 3.3(d).   Dkt. No. 184 at 16.  BGI does not meaningfully dispute that it failed to disclose this position in its invalidity contentions, but argues that I have discretion to consider the argument and should do so because BGI disclosed this challenge during the claim construction meet and confer process.  Dkt. No. 191 at 21-22.

Patent Local Rule 3-3 requires that, no later than 45 days after service of the plaintiff's

"disclosure of asserted claims and infringement contentions," a defendant serve invalidity

contentions that contain, among other disclosures, "[a]ny grounds of invalidity based on 35 U.S.C.

§ 101, indefiniteness under 35 U.S.C. § 112(2) or enablement or written description under 35

U.S.C. § 112(1) of any of the asserted claims." Local Patent Rule 3.3(d). There is no meaningful

dispute that BGI did not comply with this requirement with regard to the disputed term. BGI

attempts to argue that it put Illumina "on notice that the asserted claims of all three asserted

patents are invalid for indefiniteness in its Preliminary Invalidity Contentions," because it

disclosed other indefiniteness positions regarding other terms. Dkt. No. 191 at 22; s*ee e.g.*

Milowic Decl., Ex. K at 22. But BGI cannot preserve the right to make a specific indefiniteness

argument simply by making other, different indefiniteness arguments regarding the same patent.

*Cf. Finjan v. Proofpoint, Inc.*, Case No. 14-cv-03227-PSG, 2016 WL 791792, at *3 (N.D. Cal.

Dec. 23, 2015) (rejecting argument that defendant had "generally reserved its right to assert claims

as invalid under Section 101" by making "exemplary claims," and explaining that the

requirements of Patent Local Rule 3-3(d) "would be a nullity if parties could address it with a

broad reservation").

Because BGI did not timely disclose its indefinite position regarding this term, the

question is whether I should consider BGI's challenge despite this failure to disclose. Illumina

argues that I should not, noting that the Patent Rules are designed to "'require parties to crystallize

their theories of the case early in the litigation' so as to 'prevent the "shifting sands" approach to

claim construction.'" Dkt. No. 184 at 18 (quoting *O2 Micro Int'l Ltd. v. Monolithic Power Sys.,

Inc.*, 467 F.3d 1355, 1364 (Fed. Cir. 2006). It points to various examples in which courts in this

district have stricken indefiniteness positions not disclosed in the defendant's invalidity

contentions. Dkt. No. 184 at 17; *see also Finjan,* 2015 WL 9460295, at *3-4 (striking

indefiniteness challenges not raised in invalidity contentions; *Silicon Labs., Inc. v. Cresta Techn.

Corp.*, No. 14-cv-03227-PSG, 2016 WL 791792, at *3 (N.D. Cal. Mar. 1, 2016) (striking

indefiniteness challenges not timely raised and noting that "the disclosure requirements of this

district's patent local rules are not optional"). And it notes that if BGI wanted to add this

challenge to its invalidity contentions, it could do so only "by order of the Court upon a timely

14

showing of good cause." Patent L.R. 3-6.  Finally, Illumina argues that, while BGI disclosed an indefiniteness position regarding this term during the claim construction meet and confer process, it did not clearly lay out the basis for its challenge as it would have done if disclosed in its invalidity contentions, making it difficult for Illumina to meaningfully respond to BGI's position until after BGI properly explained it in its responsive claim construction brief.  Dkt. No. 195 at 9.

BGI responds that "the Patent Local Rules are 'not a straitjacket into which litigants are locked from the moment their contentions are served.  There is a modest degree of flexibility, at least near the outset.'"  Dkt. No. 191 at 23 (quoting *24/7 Customer, Inc. v. Liveperson, Inc.*, No. 3:15-cv-02897 JST KAW, 2016 WL 6673983, at *3 (N.D. Cal. Nov. 14, 2016) (citations omitted)).  It asserts that Illumina would not be prejudiced if I consider this indefiniteness challenge because BGI disclosed it was making such a challenge in its claim construction materials and specifically discussed the phrase "at least one" with Illumina during the parties' meet and confer.  Dkt. No. 191 at 21-22.  It further notes that Illumina failed to object to this indefiniteness challenge until the day before Illumina's claim construction briefing was due.  *Id.* at 21.

I conclude that BGI has waived the right to assert this indefiniteness challenge.  BGI is correct that there is some flexibility within the Patent Local Rules and a defendant is not necessarily "locked" into their contentions the moment they are served.  However, the Patent Local Rules lay out a particular process and standard for amending contentions that BGI has not followed, allowing a party to amend invalidity contentions "by order of the Court upon a timely showing of good cause."  Patent L.R. 3-6.   Patent Local Rule 3-6 suggests three potential bases to support a showing of good cause: (1) a claim construction from the court contrary to the party's proposed construction; (2) the discovery of material, prior art, despite earlier diligent search; and (3) discovery of nonpublic information not previously discovered despite diligent efforts.  *Id.*  And the Federal Circuit has noted that parties must "proceed with diligence in amending [their infringement and invalidity contentions] when new information comes to light in the course of discovery."  *O2 Micro*, 467 F.3d at 1366.

BGI has not attempted to amend its invalidity contentions or to make out a showing of

"good cause" to do so.  It offers no explanation as to why it did not include this challenge in its initial invalidity contentions and has not sought leave of court to make any such amendment, undermining a potential argument that it has diligently sought to amend.  Because I conclude that BGI has not made a showing of "good cause" to amend its invalidity contentions, and did not disclose this indefiniteness challenge in its preliminary contentions, BGI's challenge is improper.

### 2.  Merits of Indefiniteness Argument

Even if I consider BGI's indefiniteness challenge on the merits, I conclude that BGI has failed to carry its burden of demonstrating that the disputed term -- "wherein at least one incorporation is of a nucleotide having a removable 3' – OH blocking group covalently attached thereto" -- is indefinite.

"[A] patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus*, 572 U.S. at 901.  BGI argues that the disputed term is indefinite because the phrase "at least one" appears to mean "one or more," but for Illumina's claimed method to work, "*all* of the incorporated nucleotides must have a removable blocking group."  Dkt. No. 191 at 20.  It contends that the plain meaning of the term is therefore inconsistent with the claimed method and is irredeemably ambiguous. *Id.* at 20-21.  It asserts that the claim language would include within its scope a method where "one nucleotide has a particular reversible 3'-OH block, and the others have no 3'-OH block at all."  Dkt. No. 199 at 5.

I conclude that the disputed claim, when read in light of the specification, is sufficiently clear in its scope that it is not indefinite.  The '973 patent discloses a method of using a particular kind of blocking group in a sequencing by synthesis process to incorporate nucleotides into a growing strand, one at a time, so the nucleotide types can be detected.  As I have repeatedly noted, "[t]he focus of the patent is on the use of a blocking group to prevent new nucleotides from binding," such as in a sequencing by synthesis method.  PI Order at 6.  A person of ordinary skill in the art reading the claims, in light of the specification, would understand that the scope of the method is limited to processes in which the relevant type of blocking group is used in a sequencing process to control the incorporation of nucleotides and prevent uncontrolled binding.

16

BGI suggests that the phrase "at least one" is in conflict with the claimed method and the specification because the method only works if *all* of the incorporated nucleotides have a removable blocking group.  Dkt. No. 191 at 20.  But Illumina points out that the patent might include a method where "at least one" incorporation is of a nucleotide containing the specific 3' – OH blocking group listed in claim 1, while other incorporated nucleotides have a different kind of blocking group attached.   Dkt. No. 195 at 9-10.  It also notes that "the method could be performed with one nucleotide having a 'removable 3' – OH blocking group covalently attached thereto,' and then terminated when a nucleotide that did not contain a removable blocking group was finally incorporated."  *Id.* at 10.  It does not appear that the phrase "at least one" would confuse a person of ordinary skill in the art regarding the proper scope of the '973 patent.  Accordingly, the term is not indefinite.

For the reasons described above, I conclude that no construction is necessary for this term.

**D.**   **"wherein said molecule may be reacted to yield an intermediate in which each R" is exchanged for H"**

| Patent/Term | Illumina's Proposal | BGI's Proposal |
|---|---|---|
| **"wherein said molecule may be reacted to yield an intermediate in which each R" is exchanged for H"**<br><br>'444 Patent: claim 1, 3 | No construction necessary. | indefinite |

BGI argues that the term "wherein said molecule may be reacted to yield an intermediate in which each R" is exchanged for H" is indefinite because claim 1 of the '444 patent recites two different formulas that cover azidomethyl, but this limitation only applies to one of them, making the scope of the claim unclear.  I disagree and conclude that a person of ordinary skill in the art would not be confused regarding the scope of what is claimed.

Claim 1 of the '444 patent lists five possible chemical groups that can fulfill the claim's "Z" structure.  '444 patent at 86:4-7.  The parties agree that azidomethyl fits under two of these five formulas, $—C(R')_2—N(R")_2$, which the parties refer to as formula (2) and $—C(R')_2—N_3$, which the parties refer to as formula (5).  *See id.*  The disputed term is the final limitation of claim 1, and

United States District Court
Northern District of California

describes how a blocking group is chemically reacted and removed. *See id.* at 86:31-35.  In the PI

Order, I held that this disputed limitation does not apply to azidomethyl, as represented by formula (5),

because "[u]nlike the other enumerated structures in claim 1, there is no symbol for R" in this

structure, which indicates that the limitation regarding R" does not apply to the azido structure."  PI

Order at 8.  In my analysis, I acknowledged that azidomethyl can fall within the structure of formula

(2), but explained that "claim 1 also provides for the more specific structure, —C(R')$_2$—N$_3$, in which

—N$_3$ takes the place of N(R")$_2$" and noted that "[t]he claim language and patent specification

repeatedly describe an azido group as C(R')$_2$—N$_3$."  PI Order at 8.

      BGI argues that, because the disputed limitation does not apply to formula (5) but does

apply to formula (2), "depending on which formula is selected for azidomethyl, the scope of the

claim is different."  Dkt. No. 191 at 5.  I disagree.  As previously explained in my PI Order, I

conclude that the more specific construction of formula (5) is intended to cover azidomethyl,

rather than formula (2).  But even if we analyze azidomethyl under both formulas, the scope of the

claim is clear.  As represented by formula (5), claim 1 covers a modified molecule as described by

the patent where the Z structure is azidomethyl and the remaining applicable claim limitations are

met.  As I held in my PI Order, the disputed limitation "does not apply to instances where "Z" is

an azidomethyl," meaning that a molecule where "Z" is azidomethyl would be covered by the

claims, assuming all other relevant limitations are met, even if it does not satisfy the final

limitation.  PI Order at 8.  That formula (2) can also describe an azidomethyl does not create an

ambiguity.  That part of the claim covers a modified molecule with an azidomethyl Z structure that

*does* meet the final claim limitation, which is simply a subset of the molecules containing

azidomethyl that are covered by the formula (5) portion of the patent.  And, that a molecule

containing an azidomethyl might satisfy the claim limitations under formula (5) but not formula

(2) does not mean the scope is unclear.  The same molecule also would not satisfy the claim

limitations under formulas (1), (3), or (4), but BGI does not assert that this somehow creates

confusion as to what is covered.  A person of ordinary skill in the art would not be confused by the

scope of the claims and whether a particular product infringes.

      The cases BGI cites do not support its indefiniteness challenge.  In *Teva Pharmaceuticals*.

*USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1341 (Fed. Cir. 2015), the Federal Circuit found claims that recited the term "molecular weight" indefinite because there are multiple formulas used to calculate molecular weight but nothing in the claims, specification, or prosecution history identified which formula to apply.  Similarly, in *Dow Chem. Co. v. Nova Chems. Corp.*, 803 F.3d 620, 633 (Fed. Cir. 2015), the Federal Circuit found claims indefinite where the claims recited "a slope of strain hardening" but the patent failed to teach which of four unstated formulas to use for measuring slope of strain hardening.  The court explained that this made the claims indefinite, stating that "[b]ecause the methods do not always produce the same results, the method chosen for calculating the slope of strain hardening could affect whether or not a given product infringes the claims."  *Id.* at 634.

Those cases are not analogous to the situation here.  In *Teva* and *Dow*, the claims recited ambiguous terms that required a person to pick one of several unstated, but generally known, formulas to calculate a "molecular weight" or "a slope of strain hardening."  *See Teva*, 789 F.3d at 1341; *Dow*, 803 F.3d at 633.  Here, instead, there is no such ambiguous term and the formulas at issue serve a completely different purpose.  The '444 patent lists five different chemical groups – represented by formulas – that can satisfy the Z structure in the claim.  There is no ambiguity over which formula to use – five alternative options are explicitly listed in the claim language and they are all claimed in the patent.  There is no need to guess which formula to apply – if a product infringes the patent under any of the listed formulas it infringes the claims.

BGI's contention that the final limitation term is indefinite because it is material to patentability, but does not apply to azidomethyl, is not convincing.  BGI takes issue with the fact that, under formula (5), the final claim limitation does not apply, suggesting that this limitation represents a "feature" of the invention without which the patent is "missing [a] key element."  Dkt. No. 191 at 5-6.  But BGI does not adequately explain how this relates to its indefiniteness challenge or how this creates ambiguity about what falls within the scope of the patent.

The cases BGI cites in support are inapposite.  In *Trustees of Columbia Univ. in City of New York v. Symantec Corp.*, 811 F.3d 1359, 1365, 1367 (Fed. Cir. 2016) the Federal Circuit concluded that a claim was indefinite because it included a "step of extracting machine code

instructions from something that does not have machine code instructions" which made the claims nonsensical. Here, in contrast, the disputed limitation is not nonsensical – it makes sense as applied to four of the five possible chemical groups that can satisfy the "Z" structure. It is plausible that the limitation is simply meant to apply to some, but not all, possible "Z" formulas, as I concluded in my PI Order. BGI also cites to *Hoffer v. Microsoft Corp.,* 405 F.3d 1326, 1329 (Fed. Cir. 2005), in which the Federal Circuit noted that when a "'whereby' clause states a condition that is material to patentability, it cannot be ignored in order to change the substance of the invention." But the Federal Circuit analysis in *Hoffer* was not in the context of an indefiniteness challenge; the court was considering whether it was mandatory that the limitation apply to the claim. Here, BGI does not argue for a construction in which the disputed limitation applies to formula (5) – an issue that I already addressed in a different context in my PI Order – and so *Hoffer* is not on point.

BGI has failed to carry its burden of showing that the disputed limitation is indefinite. I conclude that no construction is necessary for this term.

### E. "that can be modified or removed to expose a 3' OH group"

| Patent/Term | Illumina's Proposal | BGI's Proposal |
|---|---|---|
| **"that can be modified or removed to expose a 3' OH group"**<br><br>'025 Patent: claims 1-21, 27-29 | No construction necessary. | indefinite |

The parties dispute the construction of the term "that can be modified or removed to expose a 3' OH group." BGI argues that this term is indefinite "because the conditions for modifying or removing the claimed azido protecting groups are not specified." Dkt. No. 191 at 23. BGI's challenge is based on the idea that there is an unstated "efficiency" limitation for the removal step in the '025 patent because Illumina has argued that the prior art "does not disclose modification or removal of azidomethyl with the required 'efficiency.'" Dkt. No. 191 at 23. Illumina objects to this challenge on the basis that it is not stated in BGI's invalidity contentions,

which instead identify this term as indefinite due to the allegedly unclear meaning of the term "modified." Dkt. No. 195 at 14. It argues that this challenge should be struck for failure to comply with the Local Patent Rules. It further argues that BGI's challenge fails on the merits because there is no "efficiency" limitation in the patent.

### 1.    Compliance With Local Patent Rules

BGI does not dispute that it did not disclose this indefiniteness theory in its invalidity contentions. In its sur-reply, it argues, in a single sentence, that Illumina "has waived any objection to the consideration of this term, for all the reasons discussed in BGI's responsive brief." Dkt. No. 199 at 5. But BGI's responsive claim construction brief does not address this issue because it was first raised in Illumina's reply brief. BGI offers no explanation or meaningful response to Illumina's assertion that BGI failed to properly disclose this theory in violation of the Patent Local Rules. Indeed, unlike the challenge to the term "wherein at least one incorporation is of a nucleotide having a removable 3' – OH blocking group covalently attached thereto," which Illumina admits BGI at least raised during the claim construction meet and confer process, there is no indication from either party that BGI disclosed the substance of this challenge prior to filing its responsive claim construction brief. Indeed, Illumina's opening brief addresses a completely different dispute over the alleged ambiguity of the term "modified," suggesting that Illumina did not understand the substance of BGI's challenge to this term prior to reviewing BGI's responsive filing.

By failing to disclose this indefiniteness argument in its invalidity contentions, BGI has failed to comply with the Patent Local Rules. *See NobelBiz, Inc. v. LiveVox, Inc.*, No. 13-cv-1773-YGR, 2-15 WL 225223, at *8 (N.D. Cal. Jan. 16, 2015) (holding "that defendants have failed to comply with the Patent Local Rules, and their indefiniteness argument was not properly raised" where invalidity contentions identified particular term as indefinite without explanation). As BGI has made no effort to explain or justify its failure to properly disclose this argument and made no request to amend its invalidity contentions, I conclude that it has waived the right to raise this challenge.

2.        **Merits Of Challenge**

Even if I address BGI's argument on the merits, I conclude that BGI has failed to show that this term is indefinite.  It argues that the term is indefinite because Illumina has suggested, in other contexts, that the claims have an implicit "efficiency" requirement, but nothing in the patent claims, specification, or prosecution history provides guidance on what constitutes "the proper efficiency."  Dkt. No. 191 at 24.  This argument has two primary flaws and does not demonstrate that the claims are indefinite.

First, BGI's argument stretches a reasonable interpretation of Illumina's prior statements regarding "efficiency."  Illumina has argued that the '025 patent is not obvious because a person of reasonable skill in the art would not have been motivated to combine the references of Zavgorodny (teaching that an azidomethyl moiety is a suitable protecting group for the 3' OH position of nucleosides) with those of Tsien (describing a process of sequencing unknown DNA involving the sequencing by synthesis method, including the labeling of nucleotides for detection and the use of a protecting group at the 3' – OH position of the nucleotide) because such a person would not have thought that azidomethyl would meet the efficiency limitations described in Tsien's method.  *See* Dkt No. 74-4 at 10-12; *Intelligent Bio-Systems, Inc. v. Illumina Cambridge Ltd.*, 821 F.3d 1359, 1363-1364 (Fed. Cir. 2016).  As a result, Illumina has argued that the novel use of azidomethyl in a sequencing by synthesis method was inventive and not invalid for obviousness.  *Id.*  This argument has nothing to do with the actual efficiency of azidomethyl in a sequencing by synthesis method, but only what expectations a person of ordinary skill in the art would have had about whether such a method would be effective.  Illumina's statements do not suggest that the '025 patent contains an "efficiency" limitation.

Second, even if Illumina's arguments did suggest such a limitation, BGI does not cite any case in which a court has read in a limitation to a patent based solely on a patentee's legal arguments during litigation.  BGI explains, at length, that no such limitation appears anywhere in the patent claims, specification, or prosecution history.  *See* Dkt. No. 191 at 24-25.  But instead of concluding that no such limitation exists, BGI points to this lack of a limitation as evidence that the patent is indefinite.  I reject this argument.  That the '025 patent does not delineate the

contours of an unstated "efficiency" limitation, of which there is no evidence anywhere in the patent claims, specification, or prosecution history, does not make the claims indefinite.

I conclude that no construction is necessary for this term.

**CONCLUSION**

I construe the disputed terms as follows:

| Patent/Term | Court's Construction |
|---|---|
| **"wherein the blocking group is removed prior to introduction of the next complementary nucleotide"**<br><br>'973 Patent: claim 1, 13 | wherein the blocking group is removed before the next complementary nucleotide is incorporated into a growing nucleotide strand complementary to the target single-stranded polynucleotide being sequenced |
| **"monitoring the sequential incorporation of complementary nucleotides"**<br><br>'973 Patent: claim 1, 13 | No construction necessary. |
| **"wherein at least one incorporation is of a nucleotide having a removable 3' – OH blocking group covalently attached thereto"**<br><br>'973 Patent: claim 1, 13 | No construction necessary. |
| **"wherein said molecule may be reacted to yield an intermediate in which each R" is exchanged for H"**<br><br>'444 Patent: claim 1, 3 | No construction necessary. |
| **"that can be modified or removed to expose a 3' OH group"**<br><br>'025 Patent: claims 1-21, 27-29 | No construction necessary. |

**IT IS SO ORDERED.**

Dated: November 24, 2020



William H. Orrick
United States District Judge