1   EDWARD R. REINES (Bar No. 135960)          MELISSA L. HOTZE (*pro hac vice*)
    edward.reines@weil.com                     melissa.hotze@weil.com
2   DEREK C. WALTER (Bar No. 246322)           WEIL, GOTSHAL & MANGES LLP
    derek.walter@weil.com                      700 Louisiana, Ste. 1700
3   NATE NGEREBARA (Bar No. 317373)            Houston, TX 77002
    nate.ngerebara@weil.com                    Telephone:  (713) 546-5000
4   MELINDA ROOT (Bar No. 334485)              Facsimile:   (713) 224-9511
    melinda.root@weil.com
5   WEIL, GOTSHAL & MANGES LLP                 AUDRA SAWYER (Bar No. 324684)
    201 Redwood Shores Parkway                 audra.sawyer@weil.com
6   Redwood Shores, CA  94065                  WEIL, GOTSHAL & MANGES LLP
    Telephone:  (650) 802-3000                 2001 M Street NW, Suite 600
7   Facsimile:   (650) 802-3100                Washington, DC 20036
                                               Telephone: (202) 682-7274
8   ANDREW P. GESIOR (*pro hac vice*)
    andrew.gesior@weil.com
9   WEIL, GOTSHAL & MANGES LLP
    767 Fifth Avenue
10  New York, NY 10153
    Telephone: (212) 310-8000
11  Facsimile: (212) 310-8007

12  *Attorneys for Plaintiffs,*
    ILLUMINA, INC. AND
13  ILLUMINA CAMBRIDGE LTD.

14                  **UNITED STATES DISTRICT COURT**
                 **NORTHERN DISTRICT OF CALIFORNIA**
15                    **SAN FRANCISCO DIVISION**

16  ILLUMINA, INC. and
    ILLUMINA CAMBRIDGE LTD.,              Case No. 3:19-cv-03770-WHO
17                                        Case No. 3:20-cv-01465-WHO
                    Plaintiffs,
18                                        **NOTICE OF MOTION AND MOTION**
        v.                                **FOR ENTRY OF A PERMANENT**
19  BGI GENOMICS CO., LTD.,               **INJUNCTION**
    BGI AMERICAS CORP.,
20  MGI TECH CO., LTD.,
    MGI AMERICAS, INC., and
21  COMPLETE GENOMICS INC.,

22                  Defendants.

23  COMPLETE GENOMICS INC.,               Judge William H. Orrick

24                  Counterclaim-Plaintiff,   Date: March 2, 2022
                                          Time: 2:00 PM
25      v.

26  ILLUMINA, INC., and
    ILLUMINA CAMBRIDGE LTD.,
27
                    Counterclaim-Defendants.
28

## TABLE OF CONTENTS

Page

I.   NOTICE OF MOTION ................................................................................................. 1

II.   RELIEF REQUESTED ................................................................................................ 1

III.   INTRODUCTION ....................................................................................................... 1

IV.   A PERMANENT INJUNCTION IS WARRANTED ................................................. 2

    A.   The Evidence At Trial Confirmed That Illumina Will Be Irreparably Harmed Absent A Permanent Injunction ....................................................................... 3

        1.   Illumina Would Suffer Irreparable Harm In The Form Of Lost Sales And Loss of Market Share ............................................................................. 3

        2.   Illumina Would Suffer Irreparable Harm In The Form Of Price Erosion ......... 5

        3.   Illumina Would Suffer Irreparable Reputational Harm ................................. 5

        4.   Illumina Has Never Licensed Its Core Sequencing Technology ..................... 7

        5.   There Is A Causal Nexus Between BGI's Infringement And The Irreparable Harm To Illumina ....................................................................... 7

    B.   Monetary Damages Are Inadequate To Compensate Illumina ..................... 9

    C.   The Balance of Harms Favors A Permanent Injunction ............................ 11

    D.   The Public Interest Is Best Served By A Permanent Injunction ................ 15

V.   CONCLUSION ......................................................................................................... 16

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Apple Inc. v. Samsung Electronics Co.*,
809 F.3d 633 (Fed. Cir. 2015)..................................................................2, 7, 14, 15

*Broadcom Corp. v. Emulex Corp.*,
732 F.3d 1325 (Fed. Cir. 2013)....................................................................2, 5, 15

*Cognex Corp. v. Microscan Sys., Inc.*,
No. 13-CV-2027 JSR, 2014 WL 2989975 (S.D.N.Y. June 30, 2014)....................................2, 10, 11

*Douglas Dynamics, LLC v. Buyers Products Co.*,
717 F.3d 1336 (Fed. Cir. 2013)...........................................................................passim

*E.I. DuPont de Nemours Company v. Unifrax I LLC*,
2017 WL 4004419 (September 12, 2017).............................................................9

*eBay Inc. v. MercExchange, L.L.C.*,
547 U.S. 388 (2006)................................................................................2, 3

*Edwards Lifesciences AG v. CoreValve, Inc.*,
699 F.3d 1305 (Fed. Cir. 2012)..............................................................2, 9

*i4i Limited. Partnership v. Microsoft Corporation.*,
598 F.3d 831(Fed. Cir. 2010)................................................................9, 15

*Inventio Ag v. Otis Elevator Co.*,
2011 WL 3480946 ...........................................................................10

*Johnstech Int'l Corp. v. JF Microtechnology*,
SDN BHD 2018 WL 3036759 (N.D. Cal. June 19, 2018)............................................3

*Novozymes A/S, v. Genencor Int'l, Inc.*,
474 F. Supp. 2d 592 (D. Del. 2007)........................................................3

*PCT Int'l Inc. v. Holland Electronics. LLC*,
2015 WL 5210628 (D. Ariz. Sept. 8, 2015), *aff'd*, 668 F. App'x 367 (Fed. Cir. 2016) ...................15

*Presidio Components, Inc. v. American Tech Ceramics Corp.*,
702 F.3d 1351 (Fed. Cir. 2012)..........................................................2, 3, 7

*Rite-Hite Corp. v. Kelley Company.*,
56 F.3d 1538 (Fed. Cir. 1995)..............................................................15

*Robert Bosch LLC v. Pylon Mfg. Corp.*,
659 F.3d 1142 (Fed. Cir. 2011)............................................................5, 9, 14

*Roy Tuccillo v. Geisha NYC*, LLC,
   635 F. Supp. 2d 227 (E.D.N.Y. 2009) ............................................................................... 11

*United States v. Marine Shale Processors*,
   81 F.3d 1329 (5th Cir. 1996).............................................................................................. 11

*Windsurfing Int'l, Inc. v. AMF, Inc.*,
   782 F.2d 995 (Fed. Cir. 1986)..................................................................................... 11, 15

**Statutes and Regulations**

35 U.S.C. § 283 ....................................................................................................................... 1, 2

Fed. R. Civ. P. 65(d)....................................................................................................................... 1

## I.       NOTICE OF MOTION

Pursuant to 35 U.S.C. § 283, Federal Rule of Civil Procedure 65(d), the equitable powers of the Court, and consistent with the jury verdict returned on November 30, 2021 [Dkt. 550], plaintiffs Illumina, Inc. and Illumina Cambridge, Ltd. (collectively "Illumina") move for a permanent injunction prohibiting BGI Americas Corp. ("BGI Americas"), MGI Tech Co., Ltd. ("MGI Tech"), MGI Americas, Inc. ("MGI"), and Complete Genomics, Inc. ("Complete Genomics") from further infringement of U.S. Patent No. 7,566,537 ("the '537 Patent"), U.S. Patent No. 9,410,200 ("the '200 Patent"), U.S. Patent No. 7,771,973 ("the '973 Patent"), and U.S. Patent No. 10,480,025 ("the '025 Patent") (collectively, the "Illumina Asserted Patents").

This motion is based on this notice and supporting memorandum, the trial record, declarations of Susan Tousi, Mark Van Oene [Dkt. Nos. 084-13, 086], and Nate Ngerebara, and such other information of which the Court may take judicial notice.  The hearing date is noticed for March 2, 2022 at 2:00 pm via videoconference before Judge William H. Orrick.

## II.      RELIEF REQUESTED

Given the jury verdict, Illumina respectfully moves the Court to convert its preliminary injunction entered on June 13, 2020, into a permanent injunction barring further infringement by BGI until the expiration of the Asserted Patents.

## III.     INTRODUCTION

This Court issued a preliminary injunction preventing BGI from distributing or using its infringing products in the United States. *Illumina I*, Dkt. No. 185 at 1.4.  The Court also determined that "the Accused StandardMPS products infringe all Asserted Claims of all Asserted Patents," and "the Accused CoolMPS products infringe the Asserted Claims of the '973 and '444 Patents."  Dkt. No. 424 at 1, 25[1].  Following a five-day trial, the jury overwhelmingly sided with Illumina finding that BGI willfully infringed the Asserted Patents. Dkt. 550.  The jury also found that Illumina was entitled to $8,000,000 in damages for BGI's internal infringement that occurred between 2014 and 2020.  *Id.* However, the jury award does not account for the harms that would occur for future infringement, including the harms threatened if BGI was permitted to commercially launch its infringing products in

[1] All citations to the docket refer to Case No. 3:19-cv-03770-WHO, unless otherwise specified.

the US.  Illumina should not have to compete in the US against infringing products designed to mimic its own products.  Moreover, the irreparable harms if BGI's infringement were judicially-blessed are many on this record, including Illumina's loss of market share, reputational harm, BGI's upgraded publicity and market visibility from its infringing engagement with KOLs, and Illumina being forced to compete against its own core technology, which it has never out-licensed.  Each of these harms is notoriously difficult to quantify, hence the need for a permanent injunction.

## IV.   A PERMANENT INJUNCTION IS WARRANTED

Normally an injunction is entered against a competitor that is a proven infringer.  *See Edwards Lifesciences AG v. CoreValve, Inc.*, 699 F.3d 1305, 1314 (Fed. Cir. 2012) ("Absent adverse equitable considerations, the winner of a judgment of validity and infringement may normally expect to regain the exclusivity that was lost with the infringement."); *Broadcom Corp. v. Emulex Corp.*, 732 F.3d 1325, 1338 (Fed. Cir. 2013) ("The courts have a long history of remedying trespass on property rights— including patent rights—by removing the trespasser."); *Presidio Components, Inc. v. American Tech Ceramics Corp.*, 702 F.3d 1351, 1362 (Fed. Cir. 2012) (holding that a proper eBay analysis "proceeds with an eye to the 'long tradition of equity practice' granting 'injunctive relief upon a finding of infringement in the vast majority of patent cases,'" and noting that "the axiomatic remedy for trespass on property rights is removal of the trespasser").  This is especially the case when the infringement is willful.  *See, e.g., Cognex Corp. v. Microscan Sys., Inc.*, No. 13-CV-2027 JSR, 2014 WL 2989975, at *2 (S.D.N.Y. June 30, 2014) ("status as a willful infringer militates in favor of granting" an injunction).

This principle is rooted in the Constitution, which provides inventors an "***exclusive*** right to their respective…discoveries."  U.S. Const. art. I, § 8, cl. 8.[2]  Congress specifically authorized injunctions to stop patent infringement, authorizing courts to "grant injunctions in accordance with the principles of equity to prevent the violation of any right secured by patent, on such terms as the court deems reasonable."  35 U.S.C. § 283.  "[H]istorically courts have 'granted injunctive relief upon a finding of infringement in the vast majority of patent cases.'"  *Apple Inc. v. Samsung Electronics Co.*, 809 F.3d 633, 639 (Fed. Cir. 2015) (*quoting eBay Inc. v. MercExchange, L.L.C.,* 547 U.S. 388, 395 (2006)).

To obtain permanent injunction, a plaintiff must demonstrate that (1) it has suffered irreparable

---

[2] Emphasis supplied unless otherwise specified.

1    injury, (2) monetary damages are inadequate, (3) considering the balance of hardships between the

2    plaintiff and defendant, an injunction is warranted, and (4) the public interest would not be disserved

3    by a permanent injunction. *eBay*, 547 U.S. 388, 391. These factors support an injunction as established

4    below.

5        A.    **The Evidence At Trial Confirmed That Illumina Will Be Irreparably Harmed Absent A Permanent Injunction**

6

7            1.    **Illumina Would Suffer Irreparable Harm In The Form Of Lost Sales And Loss of Market Share**

8            It is undisputed that BGI and Illumina are direct competitors. *See* Dkt. No. 185 PI Order (3:19-

9    cv-03770-WHO) at 19 ("BGI does not seriously dispute that it is a direct competitor of Illumina.") It

10   is also undisputed that Illumina's and BGI's products both use the same patented azido chemistry. *See*

11   Dkt. No. 540 (Trial Tr. [Romesberg]) at 646:8-11 ("Do Illumina's sequencers and sequencing reagents

12   practice the asserted patent claims…A: They all do."); *Id.* 632:7-9 ("And BGI has not contested the

13   infringement of the five patents, and it's my opinion that BGI, in addition, copied the invention"). BGI

14   specifically prices its products to take market share away from Illumina. Tousi Decl. ¶ 3; *see* Dkt. No.

15   086, Van Oene Decl. ¶ 47, 52, 68. In granting the preliminary injunction, this Court found that BGI's

16   planned commercial expansion into the US would directly compete with Illumina, and sales to BGI

17   would almost certainly translate into lost revenue for Illumina. *See id.* at 18. BGI's direct competition

18   alone shows the irreparable harm Illumina faces. *See Presidio Components*, 702 F.3d 1351, 1363

19   (overturning denial of permanent injunction, explaining "[d]irect competition in the same market is

20   certainly one factor suggesting strongly the potential for irreparable harm"); *Douglas Dynamics LLC*,

21   717 F.3d at 1345 ("Where two companies are in competition against one another, the patentee suffers

22   the harm – often irreparable – of being forced to compete against products that incorporate and infringe

23   its own patented inventions."); *see also Johnstech Int'l Corp. v. JF Microtechnology* SDN BHD, 2018

24   WL 3036759, at *2 (N.D. Cal. June 19, 2018) (finding that defendants' infringing products target the

25   "same niche market segment" as plaintiffs' and granting permanent injunction); *Novozymes A/S, v.*

26   *Genencor Int'l, Inc.*, 474 F. Supp. 2d 592, 613 (D. Del. 2007) (granting permanent injunction in a case

27   between "head-to-head competitors" and finding that plaintiff had a right "granted by Congress, not to

28   assist its rival with the use of proprietary technology").

---

1    As explained at trial by Illumina's Chief Commercial Officer, Susan Tousi, Illumina invested

2    heavily in developing the azido technology to drive down the cost of DNA sequencing.  Dkt. No. 538

3    (Trial Tr. [Tousi]) at 234:20-236:11; Ex. 1, PDX 2.1.  And Illumina continues to spend an impressive

4    18-20% of its revenue on research to further develop the technology.  *See* Dkt. No. 538 (Trial Tr.

5    [Tousi]) at 250:21-251:4 ("As I mentioned, that chemistry is absolutely core technology to us. You

6    know, we acquired it. We've spent a lot of investment to develop it. In fact, you know, amongst our

7    industry, we're known to invest the most in R&D. We spend, you know, 18 to 20 percent of our revenue

8    into R&D because, you know, we want to make sure that we have the best products. And a lot of that

9    has gone into developing out the SBS chemistry for its performance and its throughput and the cost that

10   it gives us. So it's absolutely core to us.").  The competitive pressure in the form of loss of market share,

11   and loss of sales that would occur if BGI is allowed to enter the US market was amply evident at trial.

12   Ms. Tousi explained that BGI's entry in the US market would "undercut [Illumina's] pricing,"

13   "absolutely hurt [Illumina's] business," "really destroy [Illumina's] market," and "really destroy

14   [Illumina's] business." Dkt. No. 538 (Trial Tr. [Tousi]) at 251:25-253:10.

15   Against this competitive backdrop, in markets outside the U.S., BGI positions its imitative

16   products as comparable to Illumina's sequencers in performance, while undercutting Illumina on price.

17   *See* TX494-120; Dkt. No. 538 (Trial Tr. [Tousi]) at 250:6-13 ("showing the MGI products kind of lined

18   up against the Illumina products, although Illumina has more products. The MGI products have

19   followed, they've come after us, and they followed the same kind of low-, mid-, and high-throughput.

20   And, you know, surprisingly, their specifications were almost identical to ours, including their high-

21   throughput T7 at 1 to 6 terra bases, which is exactly our NovaSeq at 1 to 6 terra bases.")[3]  This imitative

22   and aggressive approach has caused Illumina to lose sales, business opportunities, and market share

23

24   [3] The record is replete with evidence of BGI's intentional copying.  *See, e.g.*, Dkt. No. 538 (Trial Tr.
     [C. Xu]) 277 at 23-24 ("And the Zebra Project used azido block nucleotides? Yes"); *Id.* 278:6-9("Just

25   as a factual matter, the chemical structure for the three prime azidomethyl structures used by BGI in all
     its products is the same as what Illumina uses; correct? A. I think, yes."); *Id.* 288:1-7 ("My question

26   was just, it was very simple: Did the Drmanacs know that you were using the Illumina sequencing
     reagents to develop the BGI sequencing chemistry? Did they know that or not? A. Yes, they did."); *see*

27   *also* TX369 ("Since we want to mimic XY (referring to Illumina) to make sure it works in version-1").
     And confirmed by unrebutted testimony of Illumina's expert. *See* Dkt. No. 540 (Trial Tr. [Romesberg])

28   632 at 7-6 ("And BGI has not contested the infringement of the five patents, and it's my opinion that
     BGI, in addition, copied the invention.")

across the world.  Tousi Decl. ¶ 3; *see* Dkt. No. 086, Van Oene Decl. ¶¶ 52, 57, 60, 68.  If BGI is allowed to infringe in the U.S., the same types of irreparable harm would occur here.  *Id.*  The Federal Circuit has confirmed that direct competition establishes irreparable harm when market share is taken.  *Broadcom Corp.*, 732 F.3d at 1338 ("The district court determined that Broadcom and Emulex were competitors and that Broadcom lost market share while Emulex gained it—thus Broadcom established irreparable harm.").

### 2. Illumina Would Suffer Irreparable Harm In The Form Of Price Erosion

BGI's infringement has also resulted in price erosion, which, without a permanent injunction, would inevitably occur in the U.S.  Tousi Decl. ¶ 3; *see* Dkt. No. 086, Van Oene Decl. ¶¶ 62-66.  *See Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1153-54 (Fed. Cir. 2011) (discussing "price erosion, loss of market share, loss of customers, and loss of access to potential customers" as supporting irreparable harm).  As this Court observed in granting the preliminary injunction, BGI "did not seriously dispute that in China, where the parties compete, Illumina has had to lower its prices."  *See* Dkt. 185 (PI Order) at 18.  And BGI's practice of providing no-cost exemplary products to influential leaders in the industry damages Illumina by artificially driving down price, eroding Illumina's market position, and making it unsustainable for Illumina to continue its re-investment in R&D.  Tousi Decl. ¶ 3; *see* Dkt. No. 084-13 Van Oene Decl., ¶¶ 19, Dkt. No. 086, Van Oene Decl., ¶¶ 23, 60, 67.  Current and prospective customers often use BGI's presence and cut-rate pricing to negotiate and attempt to extract price concessions from Illumina.  Tousi Decl. ¶ 3; *see* Dkt. No. 086, Van Oene Decl., ¶¶ 51, 66.  BGI's planned expansion of its infringement in the U.S, which includes supplying sequencers or reagents to others at heavy discounts, means that Illumina would likely have to offer substantial discounts or be faced with a loss of business and damage to its longstanding customer relationships.  Tousi Decl. ¶ 3; *see* Dkt. No. 086, Van Oene Decl. ¶¶ 65, 66.  Moreover, once one customer receives a discount, then other customers will expect the same.  Tousi Decl. ¶ 3; *see* Dkt. No. 086, Van Oene Decl. ¶¶ 51.

### 3. Illumina Would Suffer Irreparable Reputational Harm

The irreparable harm caused by BGI is exacerbated by the nature of the marketplace for sequencers.  The sequencing market depends on developing and maintaining relationships with key opinion leaders ("KOLs"), given their substantial influence on the industry's perception of a brand and

1    the purchasing decisions of other customers in the field.  Dkt. No. 538 (Trial Tr. [Tousi]) at 248:10-11

2    (testifying that KOLs are a "reference for other customers" in their "purchasing decisions"); *id.* at

3    248:24-249:3 (KOLs have an "outsized influence on the industry").   Illumina has cultivated and

4    maintains relationships with leading KOLs, including Stanford, UCSF, Mayo Clinic.  *See* Dkt. No. 538

5    (Trial Tr. [Tousi]) at 247:17-249:3.  Illumina is recognized as an innovator by the industry, *see* Ex. 2,

6    PDX 1.9; Dkt. No. 538 (Trial Tr. [Tousi]) at 236:12-237:2; Smith Depo at 204:4-7 (characterizing

7    Illumina's innovation as a "technological miracle"); Smith Depo at 113:4-12 (commending Illumina's

8    sequencing platform); and Illumina's products are highly regarded.  *See* Dkt. No. 538 (Trial Tr. [Tousi])

9    at 236:12-237:2; Ex. 2, PDX 1.9; Dkt. No. 538 (Trial Tr. [Tousi]) at 233:3-8.  Illumina has a reputation

10   as the sole source of sequencers using the patented technology.  Smith Depo at 181:22-182:7 ("Q:

11   Illumina has a reputation as being the exclusive source of sequencers that use its patented sequencing

12   technology, correct? … THE WITNESS: Yes").

13        But, as the Court noted, sequencers can be costly and a company can expect to sell less than 500

14   units in one year.  Dkt. 185 (PI Order) at 19.  The sale of even a few sequencers is significant, and one

15   sale may entail significant reputational concerns with customers.  *Id.*  This was confirmed at trial.  Ms.

16   Tousi testified that BGI's infringement would result in reputational harm in the form of customer

17   confusion, which inevitably hurts Illumina's business.  *See* Dkt. No. 538 (Trial Tr. [Tousi]) at 252:9-12

18   ("It would be very confusing to our customers as to why someone could, you know, provide the same

19   chemistry for lower cost. And it would hurt our business. It would absolutely hurt our business.")

20        Illumina's reputation as an innovator in the sequencing market and the only supplier of its

21   industry-leading, patented technology, would be irreparably harmed by BGI's infringing commercial

22   use of the azido technology.  In *Douglas Dynamics, LLC v. Buyers Products Co.*, 717 F.3d 1336, 1344-

23   45 (Fed. Cir. 2013), the Federal Circuit reversed a denial of a permanent injunction based on

24   reputational injury, which the Court noted is often difficult to quantify.  *Id.*  The Court explained that

25   "Douglas's reputation as an innovator will certainly be damaged if customers found the same

26   'innovations' appearing in competitors' snowplows."  *Id.*  "Exclusivity is closely related to the

27   fundamental nature of patents as property rights. It is an intangible asset that is part of a company's

28   reputation, and here, Douglas's exclusive right to make, use, and sell the patented inventions is under

attack by Buyers's infringement." *Id.*

### 4.  Illumina Has Never Licensed Its Core Sequencing Technology

An "unwillingness to license favor[s] finding irreparable injury."  *Presidio*, 702 F.3d at 1363. Illumina would be further irreparably harmed because it does not and has never licensed out its core sequencing technology, much less, to a direct competitor.  Dr. Romesberg testified that Illumina does not license its core technology.  Dkt. No. 540 (Trial Tr. [Romesberg]) at 694:8-13 ("So I reviewed the deposition of an Illumina executive, Mr. Role -- or Dr. Role, who stated in his deposition that Illumina does very little outlicensing and does not license out any of its core sequencing technology. And by "core sequencing technology," he meant the SBS sequencing technology that the azido patents are part of."); Dkt. No. 542 (Trial Tr. [Kearl]) at 986: 3-12 (BGI's expert noting that Illumina was "reluctant to license" its azido technology); Dkt. No. 542 (Trial Tr. [Kearl]) at 984:11-21 (BGI's expert acknowledging that he understood that Illumina doesn't license its azido patents).  Illumina's ability to exclude others from making and offering to sell products that infringe the Asserted Patents, by incorporating the azido protecting group, gives Illumina a competitive advantage as provided for by the Constitution.  *See Douglas Dynamics*, 717 F.3d at 13445 ("[e]xclusivity is closely related to the fundamental nature of patents as property rights. It is an intangible asset that is part of a company's reputation, and here, [plaintiff's] exclusive right to make, use, and sell the patented inventions is under attack by [defendant's]infringement.").

### 5.  There Is A Causal Nexus Between BGI's Infringement And The Irreparable Harm To Illumina

The irreparable harm Illumina would suffer from BGI's infringing activities is causally linked to BGI's infringement.  *See Apple*, 809 F.3d at 640 ("The purpose of the causal nexus requirement is to establish the link between the infringement and the harm, to ensure that there is 'some connection' between the harm alleged and the infringing acts.").  This test is normally at issue for multi-function products, where any particular patented feature may have little to do with consumer purchase decisions. Illumina's azido technology is foundational and a key driver of its industry recognition and customer purchases, putting it on the other end of the "causal nexus" spectrum.  During the preliminary injunction proceeding, this Court rightly rejected BGI's nexus arguments that its products had advantages over

1   Illumina's other than the accused features.  *See* Dkt. 185 (PI Order) at 18

2       Instead, as supported by the evidence at trial, the patented azido blocking group, was an

3   incredible advancement that significantly drove down the cost of DNA sequencing.  *See* Ex. 1, PDX2.1;

4   Dkt. No. 538 (Trial Tr. [Tousi]) at 234:12-236:11 (describing how Illumina reduced the price of DNA

5   sequencing from more than $100,000 in 2012 to less than $600); *see also* Smith Depo 201:23-202:6

6   ("Among the contributions to the incredible improvement in DNA sequencing technology brought by

7   Illumina, one of them is the patented azido technology that's at issue in this case; isn't that correct?

8   THE WITNESS: I would speculate that that is true."); *id.* 202:7-12 ("Q: When you say you speculate,

9   that's what you believe, based on all your work in this case, correct? THE WITNESS: Yes."); *id.* at

10  203:23-204:7 ("Q. And you'll agree that the patented azido technology at issue in this case is one

11  important aspect of that technological miracle, although there are others. THE WITNESS: As stated

12  before, the 200-fold increase on 454 and the 6000 increase on Illumina is the technological miracle, and

13  yes, Illumina contributed greatly towards that.").  Moreover, BGI and other research teams made

14  multiple failed attempts to develop an alternative to the azido blocking group.  *See*, *e.g.*, Dkt. No. 539

15  (Trial Tr. [R. Drmanac]) at 452:18-454:18 (testifying that people at BGI diligently tried many

16  alternative blocking groups from 2015 to 2020).

17      And to date, even after so many years on the market, Illumina's azido chemistry remains highly

18  regarded, and BGI claims it has been unable to develop an acceptable alternative.  Dkt. No. 538 (Trial

19  Tr. [Tousi]) at 233:1-9 (testifying that Illumina's products using the azido chemistry are the "gold

20  standard"); Dkt. No. 539 (Trial Tr. [C. Xu]) at 326:6-25 (testifying that he believed that the azido

21  blocking group was the "best chemistry"); Dkt. No. 540 (Trial Tr. [S. Drmanac]) at 741:1-11 (agreeing

22  that "Illumina's azido patent, [was the] best chemistry so far").  Even, BGI's CSO, Dr. Drmanac agreed

23  that the azido blocking group was key to the success of Illumina's sequencing platforms.  Dkt. No. 539

24  (Trial Tr. [R. Drmanac]) at 459:15-19 ("The question was (as read): "QUESTION: Do you agree with

25  Dr. Smith that the azido blocking group is a component of the success of the various successful Illumina

26  sequencing platforms?" And your answer was: "Yes.").  The nexus between the infringement of

27  Illumina's azido patents and the irreparable harm is manifest.

28

**B.     Monetary Damages Are Inadequate To Compensate Illumina**

Damages will not compensate a patent holder for the loss of market share such as that threatened here. *Douglas*, 717 F.3d at 1345 ("[M]ere damages will not compensate for a competitor's increasing share of the market, a market which [Plaintiff] competes in, and a market that [Plaintiff] has in part created with its investment in patented technology."). BGI's infringement directly impacts Illumina's market share. *See E.I. DuPont de Nemours Company v. Unifrax I LLC*, 2017 WL 4004419, at *5 (September 12, 2017) ("Monetary damages are inadequate to compensate Plaintiff here because Plaintiff would be forced to compete against a rival gaining market share with Plaintiff's technology.") Infringing competition such as this is normally enjoined because it is not compensable by money. *See, e.g., Edwards Lifesciences*, 699 F.3d at 1314 ("Absent adverse equitable considerations, the winner of a judgment of validity and infringement may normally expect to regain the exclusivity that was lost with the infringement.").

Moreover, damages are inadequate when the defendants' infringement "significantly changes the relevant market." *i4i Limited. Partnership v. Microsoft Corporation.*, 598 F.3d 831, 862. This Court found that in the market for the patented technology, "Illumina is currently the primary actor", and BGI's commercial expansion into the United States would change the market. *See* Dkt 185 (PI Order) at 18; *see also Robert Bosch LLC v. Pylon Manufacturing*, 659 F.3d 1142, 1151. Sales made to BGI would almost certainly translate to lost revenue for Illumina. Dkt 185 (PI Order) at 18. Additionally, the customer confusion and erosion of reputation due to BGI's contacts with and offer of products to KOLs is exactly the type of "non-quantifiable harm that cannot be remedied by monetary damages". *See* Dkt 185 (PI Order) at 19.

Similarly uncompensated by money damages is the harm Illumina would suffer from BGI's planned engagement with KOLs. As the Court rightly noted, "BGI's contacts with and offer of products to KOLs is the type of non-quantifiable harm that cannot be remedied by monetary damages." Dkt 185 (PI Order) at 18, *see also* Tousi Decl. ¶ 3; Dkt. No. 086, Van Oene Decl. ¶ 67-68 (explaining why the harms are unquantifiable). Placing instruments with US-based KOLs would seed the market with BGI's products. Tousi Decl. ¶ 3; *see* Dkt. No. 086, Van Oene Decl. ¶ 49. Even if BGI's instruments were initially placed on a "no-cost trial basis," this would give them a key entry point into the U.S. market

1   to allow them to embed themselves with Illumina's customers, while taking KOL time and mindshare

2   away from Illumina's products.  *Id.*  Additionally, BGI's infringing engagement with KOLs has already

3   driven some collaborative publications with the KOLs.  *See* Ex. 3, Sophie Liu Depo. at 40:16-42:17;

4   Ex. 4, ILMNBGI0725664-691 (TX1114).  Such publications improve the market's perception of BGI's

5   products.  Tousi Decl. ¶ 3; *see* Dkt. No. 086, Van Oene Decl. ¶ 49.  Notably, BGI's expert, Dr. Kearl

6   did not know, nor understand the importance of the KOL relationships.  *See* Dkt. No. 542 (Trial Tr.

7   [Kearl]) at 995:5-9 ("But put simply, you'll acknowledge that you didn't know why KOL relationships

8   were important in the sequencing area, right, when you formulated your opinions and came to the

9   numbers you came to? A. Yes."); *id.* 996:7-8 ("Did you know about the UCSF relationships? A. I did

10  not").  Nor did he attempt to quantify these relationships.  *See* Dkt. No. 542 (Trial Tr. [Kearl]) at 995:13-

11  14 ("And you didn't do anything to try to quantify them (the value of KOL relationships); right? A.

12  No.").   The influence on market choice by KOLs is substantial and long-term, and is neither

13  quantifiable, nor compensable by money damages.  *Id.*

14       Finally, without an injunction, Illumina is effectively compelled to grant BGI a compulsory

15  license, which irreparably harms its right to exclude.  Illumina does not and has never licensed out its

16  azido technology, much less, a direct competitor.  *See* Dkt. No. 540 (Trial Tr. [Prowse]) at 694:8-13;

17  Dkt. No. 542 (Trial Tr. [Kearl]) at 986:3-12; Dkt. No. 542 (Trial Tr. [Kearl]) at 984:11-21.  And, in the

18  US, Illumina has developed a reputation for being the exclusive source of sequencers that use the azido-

19  blocking group.  *See* Dkt. No. 542 (Trial Tr. [Kearl]) at 986:17-21 ("And you understood that Illumina

20  has a reputation as being the exclusive source of sequencers that use its patented sequencing

21  technology? A. That, I don't know. It -- certainly inside the United States…").  Illumina's policy of not

22  licensing its core technology further emphasizes that market exclusivity is an intangible and essential

23  aspect of its business, rendering monetary damages insufficient to compensate for BGI's infringement.

24  *See Douglas Dynamics*, 717 F.3d at 1345 (holding that the fact that plaintiff never licensed the infringed

25  patents to maintain market exclusivity was an intangible asset that was part of the company's

26  reputation); *see also Cognex Corp.*, *v. Microscan Systems, Inc.,* 2014 WL 2989975, at *2 (finding

27  monetary damages insufficient due in part to plaintiff's policy of not licensing to competitors); *Inventio

28  Ag v. Otis Elevator Co.*, 2011 WL 3480946, at *2 ("The injury is, ultimately, [Plaintiff]'s loss of the

---

right to exclude. 'A compulsory license, which may arise from a refusal to enjoin, is fundamentally at odds with the right of exclusion built into our patent system. . . .' It is, in fact, the antithesis of what the patent system was created to preserve. The right to keep someone from using a patented technology is what the patent confers; allowing someone to use the patent if he pays some price (and not necessarily a price set by the patentee) eviscerates that right. [Patentee] 'has a right, granted by Congress, not to assist [its] rival with the use of proprietary technology. . . .' That right simply cannot be quantified.") (internal citations omitted); *Novozymes A/S*, 474 F. Supp. 2d at 612 ("Here, [Patentee] . . . licenses both patents to its U.S. subsidiary . . . with the expectation that the value of its subsidiary will increase with the successful marketing of the licensed technology. The subsidiary markets one of the two alpha-amylases, and [Patentee] expects its patents to exclude competitors from marketing either of them. In those circumstances, even though [Patentee] does not market the alpha-amylases itself, it has suffered harm beyond the reasonable royalty that it can recover from Defendants. And [Patentee] will continue to suffer such irreparable harm if Defendants are not enjoined from infringing on [Patentee]'s right to exclude.").

### C.    The Balance of Harms Favors A Permanent Injunction

The jury determined that BGI's infringement was willful.  Dkt. 550.  Courts have found that willful infringement heavily shifts the balance of hardships in favor of granting an injunction.  *Cognex Corp.*, 2014 WL 2989975, at *2 (holding that defendant's "status as a willful infringer militates in favor of granting at least some form of injunction"); *see also Windsurfing Int'l, Inc. v. AMF, Inc.,* 782 F.2d 995, 1003 n. 12 (Fed. Cir. 1986) (suggesting that courts need not balance hardship when defendant's conduct is willful); *United States v. Marine Shale Processors*, 81 F.3d 1329, 1358 (5th Cir. 1996) (same).  Because BGI assumed the risk through its willful infringement, any harm suffered is discounted by the fact that BGI brought this injury upon itself.  *See Roy Tuccillo v. Geisha NYC*, LLC, 635 F. Supp. 2d 227, 247 (E.D.N.Y. 2009) (holding that due to knowingly copying, any potential loss suffered by an injunction was self-imposed and granting a preliminary injunction).

First, the availability of a commercially viable non-infringing alternative means BGI will not be harmed by a permanent injunction.  BGI's witnesses admitted that BGI has already identified non-azido blocking groups.  *See, e.g.*, Ex. 5 (July 9, 2021 X. Xu Depo. Tr.) at 59:17-60:1 ███████

1   ███████████████████████████████ Ex. 6 (Mar. 2, 2021 H. Li Depo Tr.) at 198:1-4,

2   207:1-25 ████████████████████████████████████████ 3770

3   Dkt. No. 566-7 at 312:11-313:2 (C. Xu testifying that BGI had found a blocking group believed to be

4   ***better*** than azidomethyl).  And, according to its witnesses, BGI's alternative chemistry should already

5   be commercially viable.  *See, e.g.*, 3770 Dkt. No. 319-10 at 75:3-21, 87:24-89:2, 252:6-253:2 (R. Tan

6   admitting that the non-azidomethyl blocking group is in such an advanced stage that it is being used

7   with KOLs.); Ex. 7 (Mar. 25, 2021 J. Wang. Depo. Tr.) at 78:18-79:25, 87:1-6 ████████████████

8   ████████████████████████████████████████ Ex. 8 (June 2, 2021 H. Li

9   Depo. Tr.) at 41:21-42:8 ████████████████████████████████████████

10  █████   3770 Dkt. No. 566-7 at 313:8-18 (Dr. Xu testified last August that BGI would make products

11  with an alternative blocking group ready for launch by the end of 2021.)  As such, BGI will suffer no

12  cognizable harm from a permanent injunction barring use of the azido-chemistry in the US.

13      Moreover, if BGI insists on using the azido chemistry, BGI could easily move the infringing

14  research and development abroad.  *See, e.g.*, Dkt. No. 540 (Trial Tr. [R. Drmanac]) at 602:16-20; Dkt.

15  No. 540 (Trial Tr. [S. Drmanac]) at 733:8-15 (testifying that it would be very easy to conduct research

16  via zoom meetings) ("Q. Now, for this type of work, this work that you were doing after the acquisition,

17  how difficult would it be if your team were not on-site with you in San Jose but were somewhere else,

18  for example, in -- with BGI in China? A. Well, ***not at all difficult because currently we are working***

19  ***with team in Shenzhen and the Zoom meetings*** and basically giving them instructions, analyzing their

20  data. ***It's very easy***.") (emphasis added); Dkt. No. 542 (Trial Tr. [Kearl]) at 950:1-2 ("I talked with Dr.

21  Drmanac about it and asked point-blank could this research be done in China, and he indicated yes");

22  Dkt. No. 542 (Trial Tr. [Kearl]) at 969:22-970:1 ("In the negotiation, CGI would say 'We can take a

23  license and do the research in the United States, or we can choose not to infringe by not doing the

24  research in the United States and doing it someplace else.' ***And in this case, they could do it in China***");

25  Dkt. No. 542 (Trial Tr. [Kearl]) at 991:7-9 ("A. It was a very short conversation. I simply asked him

26  (R. Drmanac): Could this research have been done in China? And the answer was 'yes.'").  Given the

27  supposed ease of avoiding infringement that BGI has claimed, a permanent injunction would not be

28  unreasonably burdensome. *Douglas Dynamics, LLC*, 717 F.3d 1336, 1345 (Where a competitor "ha[s]

1   a non-infringing alternative which it could easily deliver to the market, then the balance of hardships

2   would suggest that [it] should halt infringement and pursue a lawful course of market conduct.")

3          Additionally, BGI would suffer no harm if StandardMPS is permanently enjoined because BGI

4   asserted that it "ha[s] no intention of selling" StandardMPS in the U.S. before the relevant azido patents

5   expire.  *See* Dkt. 67-3 at 1.  Furthermore, there are KOLs outside the US.  Ex. 9, Smith Depo at 44:1-

6   45:4.  Assuming it does not infringe other legal rights, a permanent injunction would not prevent BGI

7   from continuing to engage with KOLs abroad in countries where it will not infringe Illumina's patents,

8   sell its test "send out" services to U.S. customers using its instruments abroad, or perform R&D using

9   its sequencers abroad, all of which they have been doing for years outside the U.S.  *See* Dkt. 10-4 at ¶¶

10  61-63.

11         Similarly, BGI will not be harmed if CoolMPS is permanently enjoined.  BGI's CEO, Dr. Wang

12  Jian testified at length that CoolMPS is neither mature, nor commercially viable.  Dkt. No. 538 (Trial

13  Tr. [Jian Wang]) 272 at 20; *see* Jian Wang Depo. 19:3-10 ("Q: ·Are you familiar with the presentation

14  that Rade Drmanac gave where he introduced CoolMPS and stated it would be sold in the United States?

15  A: ·I was aware of this technology of his, but at the time, ***it was not a mature one***, so – and eventually,

16  how he was talking about it, I do not know the details.  ***And that technology even now is still not***

17  ***mature***.") (emphasis added); *id.* 37:10-14 ("Q. · Is the CoolNGS technology mature today? A: ·We still

18  have not really used it ourselves. We just – it's still -- it's still being tried, being experimented in lab.");

19  *id.* 55:2-10 ("After the refusal by the U.S. Patent Office regarding our challenge, it was impossible for

20  us to forcibly push this product. ***I also did not approve the sales of CoolNGS in the U.S***. My

21  encouragement and support to them was to complete the research and development of this product and

22  sell it when it is ***mature and non-infringing***."); *id.* 85:11-13; *id.* 85:20-23("Can you answer any more

23  directly about whether or not CoolMPS technology is mature enough to be for markets than you have

24  so far? A: We are using it internally. However, we ***do not have any plan to commercialize it right***

25  ***now***."); Dkt. No. 539 (Trial Tr. [R. Drmanac]) 492:14-17 (confirming that CoolMPS is not mature).  In

26  light of Chairman Wang's testimony, BGI will not be harmed by a permanent injunction barring release

27  of the CoolMPS products into the U.S., given how limited BGI's interest is in that technology, according

28  to the company's leadership.

1    In contrast, denying a permanent injunction would require Illumina to compete against its own

2    patented technology—an outcome the Federal Circuit has held "places a substantial hardship on [the

3    patentee]."   *Robert Bosch LLC*, 659 F.3d 1142, 1156.   The trial evidence confirmed that BGI

4    benchmarks its products against Illumina's.   *See* TX494-120 (illustrating how BGI targets the entire

5    spectrum of Illumina sequencers in its marketing efforts); Dkt. No. 538 (Trial Tr. [Tousi]) 250:6-13

6    ("showing the MGI products kind of lined up against the Illumina products, although Illumina has more

7    products. The MGI products have followed, they've come after us, and they followed the same kind of

8    low-, mid-, and high-throughput. And, you know, surprisingly, their specifications were almost

9    identical to ours, including their high-throughput T7 at 1 to 6 terra bases, which is exactly our NovaSeq

10   at 1 to 6 terra bases.").   Where a plaintiff would be forced to compete against its own patent but for an

11   injunction, courts are inclined to weigh the balance of harms in its favor.   *Apple Inc.*, 809 F.3d 633,

12   646.   Here, the unrefuted trial evidence of BGI's copying was overwhelming.   *See, e.g.*, Dkt. No. 538

13   (Trial Tr. [C. Xu]) 277 at 23-24 ("And the Zebra Project used azido block nucleotides? Yes"); *id.* 278:6-

14   9("Just as a factual matter, the chemical structure for the three prime azidomethyl structures used by

15   BGI in all its products is the same as what Illumina uses; correct? A. I think, yes."); *id.* 288:1-7; Dkt.

16   No. 538 (Trial Tr. [C. Xu]) 311:2-4 (testifying that his team hired Acme Biosciences to analyze

17   Illumina's nucleotides); *see also* TX2539; TX369 ("Since we want to mimic XY (referring to Illumina)

18   to make sure it works in version-1"); Dkt. No. 540 (Trial Tr. [Romesberg]) 632 at 7-6 ("And BGI has

19   not contested the infringement of the five patents, and it's my opinion that BGI, in addition, copied the

20   invention.").   Absent a permanent injunction, Illumina would be forced to compete against its own

21   technology.

22   BGI's credibility on the harm issue is disappointing.   Its representations to this Court that a

23   preliminary injunction would result in 54 local employees being laid off was not true.   *See* 2020-04-29

24   Ex. 10, Zhao Depo. 223:24-224:5 ██████████████████████████████████████████

25   ████████████████████████  Ex. 11, PDX 3.54 (excerpt from Honglin Zhao Declaration); Ex.

26   12, Deposition Exhibit 64 of Honglin Zhao ███████████████████████████

27   ███  Dkt. No. 540 (Trial Tr. [Romesberg]) 654:4-15 (testifying about Zhao's declaration).   *But see* Ex.

28   3, 2020-12-15 Sophie Liu Depo. at 53:25-54:8 ("Q: Has the – has BGI laid anybody off as a result of

the preliminary injunction that was entered in this case? THE WITNESS: I don't know how to answer your question. There is – as I mentioned to you, there is – you know, since the pandemic, it's – ***there is no company announcement in terms of laying people off***") (emphasis added) . Moreover, the self-inflicted consequences of BGI's willful infringement are irrelevant to the balance of hardships. *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 862 (Fed. Cir. 2010) ("The district court's analysis properly ignored the expenses Microsoft incurred in creating the infringing products. Similarly irrelevant are the consequences to Microsoft of its infringement, such as the cost of redesigning the infringing products."). Similarly, BGI's investment expenses, expenses related to the developing the infringing CoolMPS chemistry, or expenses that may accrue to redesign the infringing systems should be ignored. *Id*; *PCT Int'l Inc. v. Holland Electronics. LLC*, 2015 WL 5210628, at *26 (D. Ariz. Sept. 8, 2015), *aff'd*, 668 F. App'x 367 (Fed. Cir. 2016) ("The expenses of the infringer in creating the infringing products and the cost of redesigning the infringing products are not relevant to the balance of hardships analysis because "neither commercial success[ ] nor sunk development costs[ ] shield an infringer from injunctive relief.").

In sum, the documented harm to Illumina by BGI's continued willful infringement–including the loss of potential customers, loss of sales and market share, the harm to Illumina's reputation and relationships with KOLs, and requiring Illumina to compete against its own patented technology–dwarfs any speculative harm to BGI were it permanently enjoined from infringing. "One who elects to build a business on a product found to infringe cannot be heard to complain if an injunction against continuing infringement destroys the business so elected." *Broadcom Corp.*, 543 F.3d at 704 (*citing Windsurfing Int'l, Inc. v. AMF, Inc.*, 782 F.3d 995, 1003 n. 12 (Fed. Cir. 1986)).

### D.     The Public Interest Is Best Served By A Permanent Injunction

The public interest nearly always favors an injunction, absent some compelling reason to the contrary. *Apple*, 809 F.3d at 647. Only "in rare instances" have courts "exercised their discretion to deny injunctive relief in order to protect the public interest." *Rite-Hite Corp. v. Kelley Company.*, 56 F.3d 1538, 1547 (Fed. Cir. 1995). The public has an interest in the preservation of intellectual property, and "generally does not benefit when...competition comes at the expense of a patentee's investment-backed property right." *Apple Inc.*, 809 F.3d at 647 (finding this factor strongly in favor of the patent

holder); *See, e.g., Douglas Dynamics, LLC v. Buyers Prods. Co.*, 717 F.3d 1336, 1346 (Fed. Cir. 2013) ("In sum, the public has a greater interest in acquiring new technology through the protections provided by the Patent Act than it has in buying "cheaper knock-offs").  The public would be disserved by allowing BGI to continue willfully infringing Illumina's patented technology, as "cheap copies of patented inventions have the effect of inhibiting innovation and incentive." *Douglas Dynamics, LLC*, 717 F.3d at 1346.

During the preliminary injunction proceeding, BGI argued that consumers will benefit if it was allowed to enter the U.S. market and directly compete against Illumina to drive down prices.  Dkt. 67-3 at 29-30.  But the Federal Circuit has long recognized that price undercutting by infringers does not benefit the public interest.  *See, e.g., Douglas Dynamics*, 717 F.3d 1336, 1345-1346.  Infringers "will often find it easier to avoid the costs and risks of research and development and just 'compete' by infringement." *Id.*

Regardless, Illumina has consistently and steadily lowered the cost of sequencing on its own. *See* Dkt. No. 538 (Trial Tr. [Tousi]) at 234:12-236:11 (describing how Illumina reduced the price of DNA sequencing from more than $100,000 in 2012 to less than $600); Dkt. No. 538 (Trial Tr. [Tousi]) at 253:4-10 ("We've been bringing the cost of sequencing down, as I -- as we saw from the graphic. We've been doing it in a consistent way. We've been investing in the technology to do it so we can do it in a sustainable way. You know, if someone just copies your technology without having to invest in it and sells it for lower, you know, that really destroys our -- destroys our business."); *see also* Smith Depo 97:25-98:4 ("I am a huge fan of the Illumina sequencing platform, and I applaud them for their remarkable success and the fact that they drove the $1 million cost to substantially below $1,000 -- well, two -- less than $1,000, all because of Illumina, yes."); *id.* 98:13-18 ("Q. Okay. And that -- the phenomenally low price there was achieved by innovation by Illumina; is that correct? A. Again, I really am a big fan of Illumina sequencing and I applaud what they've been able to do; absolutely, yes"). Illumina's steady and continued reduction in the price of DNA sequencing demonstrates that the public will not be harmed by a permanent injunction.

## V.    CONCLUSION

For the foregoing reasons, the Court should permanently enjoin BGI's continued infringement

1    of Illumina's Patents.  This willful infringement causes irreparable harm that cannot be compensated

2    through money damages or other legal remedies.  Such an injunction causes no unfair prejudice to BGI

3    while denial of the injunction will cause considerable hardship to Illumina and damage the public trust.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1   Date:  January 11, 2022                     Respectfully submitted,

2
                                                 */s/ Edward R. Reines*
3
                                                EDWARD R. REINES (Bar No. 135960)
                                                DEREK C. WALTER (Bar No. 246322)
4                                               NATE NGEREBARA (Bar No. 317373)
                                                MELINDA ROOT (Bar No. 334485)
5                                               WEIL, GOTSHAL & MANGES LLP
                                                201 Redwood Shores Parkway
6                                               Redwood Shores, CA 94065
                                                Tel: (650) 802-3000
7                                               Fax: (650) 802-3100
                                                edward.reines@weil.com
8                                               derek.walter@weil.com
                                                nate.ngerebara@weil.com
9                                               melinda.root@weil.com

10
                                                MELISSA L. HOTZE (*pro hac vice*)
11                                              WEIL, GOTSHAL & MANGES LLP
                                                700 Louisiana, Ste. 1700
12                                              Houston, TX 77002
                                                Telephone:  (713) 546-5000
13                                              Facsimile:   (713) 224-9511
                                                melissa.hotze@weil.com
14
                                                ANDREW P. GESIOR (*pro hac vice*)
15                                              WEIL, GOTSHAL & MANGES LLP
                                                767 Fifth Avenue
16                                              New York, NY 10153
                                                Telephone: (212) 310-8000
17                                              Facsimile: (212) 310-8007
                                                andrew.gesior@weil.com
18
                                                AUDRA SAWYER (Bar No. 324684)
19                                              WEIL, GOTSHAL & MANGES LLP
                                                2001 M Street NW, Suite 600
20                                              Washington, DC 20036
                                                Telephone: (202) 682-7274
21                                              audra.sawyer@weil.com

22                                              *Attorneys for Plaintiffs*
                                                ILLUMINA, INC. AND ILLUMINA
23                                              CAMBRIDGE LTD.

24

25

26

27

28