EDWARD R. REINES (Bar No. 135960)
edward.reines@weil.com
DEREK C. WALTER (Bar No. 246322)
derek.walter@weil.com
NATE NGEREBARA (Bar No. 317373)
nate.ngerebara@weil.com
MELINDA ROOT (Bar No. 334485)
melinda.root@weil.com
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA  94065
Telephone:  (650) 802-3000
Facsimile:   (650) 802-3100

ANDREW P. GESIOR (*pro hac vice*)
andrew.gesior@weil.com
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

AUDRA SAWYER (Bar No. 324684)
audra.sawyer@weil.com
WEIL, GOTSHAL & MANGES LLP
2001 M Street NW, Suite 600
Washington, DC 20036
Telephone: (202) 682-7274

*Attorneys for Plaintiffs,*
ILLUMINA, INC. AND
ILLUMINA CAMBRIDGE LTD.

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| ILLUMINA, INC. and ILLUMINA CAMBRIDGE LTD., <br><br> Plaintiffs, <br><br> v. <br><br> BGI GENOMICS CO., LTD., BGI AMERICAS CORP., MGI TECH CO., LTD., MGI AMERICAS, INC., and COMPLETE GENOMICS INC., <br><br> Defendants. | Case No. 3:19-cv-03770-WHO <br> Case No. 3:20-cv-01465-WHO <br><br> **PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR ENTRY OF A PERMANENT INJUNCTION** <br><br> Judge William H. Orrick |
| COMPLETE GENOMICS INC., <br><br> Counterclaim-Plaintiff, <br><br> v. <br><br> ILLUMINA, INC., and ILLUMINA CAMBRIDGE LTD., <br><br> Counterclaim-Defendants. | |

**TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ................................................................................................. 1

II.     BGI FAILS TO REBUT ILLUMINA'S SHOWING OF IRREPARABLE HARM ................ 1

        1.    The Presence of Other Competitors In the NGS Market Is Irrelevant .............. 1

        2.    BGI Does Not Meaningfully Dispute Illumina's Proof Of Lost Market Share, Lost Sales And Price Erosion ................................................................. 2

        3.    BGI Does Not Refute Illumina's Showing of Reputational Harm ................... 4

        4.    BGI Does Not Dispute That Illumina Has Not Licensed Its Core Sequencing Technology ........................................................................................................ 5

        5.    There Is A Direct Causal Nexus Between BGI's Infringement And Illumina's Irreparable Harm ............................................................................... 5

III.    MONETARY DAMAGES ARE INADEQUATE TO COMPENSATE ILLUMINA ............. 7

IV.     BGI FAILS TO REBUT ILLUMINA'S SHOWING THAT THE BALANCE OF HARMS FAVORS AN INJUNCTION ................................................................................... 8

V.      THE PUBLIC INTEREST IS BEST SERVED BY A PERMANENT INJUNCTION ........... 9

VI.     BGI'S UNCLEAN HANDS ARGUMENT IS MERITLESS ................................................. 12

        A.    Illumina Did Not Mischaracterize the Prior Proceedings ........................... 12

        B.    Illumina Did Not Mischaracterize the 973 Disclosure ................................. 13

VII.    THE SCOPE OF THE PROPOSED INJUNCTION IS PROPER ........................................ 13

VIII.   CONCLUSION .................................................................................................... 15

1

**TABLE OF AUTHORITIES**

2

**Page**

3

**Cases**

4

*3D Sys., Inc. v. Aarotech Lab'ys, Inc.*,
   160 F.3d 1373 (Fed. Cir. 1998)..................................................................................... 13

5

*Apple Inc. v. Samsung Elecs. Co., Ltd.*,
   809 F.3d 633 (Fed. Cir. 2015)........................................................................................ 6

6

7

*Asetek Danmark v. CMI USA, Inc.*,
   No. 13-cv-00457-JST, 2016 WL 31674 (N.D. Ca. Jan. 4, 2016) .................................... 14

8

9

*Atlas Powder Co. v. Ireco Chems.*,
   773 F.2d 1230 (Fed. Cir. 1985)....................................................................................... 8

10

*Celsis in Vitro, Inc. v. CellzDirect, Inc.*,
   664 F.3d 922 (Fed. Cir. 2012)...................................................................................... 3, 7

11

12

*Douglas Dynamics, LLC v. Buyers Prod. Co.*,
   717 F.3d 1336 (Fed. Cir. 2013).............................................................................. 2, 4, 11

13

14

*E.I. DuPont de Nemours Company v. Unifrax I LLC*,
   No. 14–1250–RGA, 2017 WL 4004419 (September 12, 2017) ........................................ 4

15

16

*i4i Ltd. P'ship v. Microsoft Corp.*,
   598 F.3d 831 (Fed. Cir. 2010)....................................................................................... 11

17

*Illumina Inc. et al v. BGI Genomics Co., Ltd. et al*,
   Case No. 3:20-cv-01465-WHO ...................................................................................... 14

18

19

*J&M Indus., Inc. v. Raven Indus., Inc.*,
   No. 16-2723-JWB, 2021 WL 5769360 (D. Kan. Dec. 6, 2021) ...................................... 14

20

21

*McComb v. Jacksonville Paper Co.*,
   336 U.S. 187 (1949)..................................................................................................... 14

22

*Presidio Components, Inc. v. American Technical Ceramics Corp.*,
   702 F.3d 1351 (Fed. Cir. 2012)....................................................................................... 1

23

24

*Rite-Hite Corp. v. Kelly Co.*,
   56 F.3d 1538 (Fed. Cir. 1995)....................................................................................... 10

25

26

*RMH Tech, LLC v. PMC Indus.*,
   352 F. Supp. 3d 164 (D. Conn. Dec. 18, 2018).............................................................. 8

27

*Robert Bosch, LLC v. Pylon Manufacturing, Corp*,
   659 F.3d 1142 (Fed. Cir. 2011)....................................................................................... 3

28

*Skydive Arizona, Inc. v. Quattrocchi*,
  673 F.3d 1105 (9th Cir. 2012)........................................................................................ 14

**Rules**

35 U.S.C. § 103 ................................................................................................................. 13

35 U.S.C. § 271(a).............................................................................................................. 13

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## I.    INTRODUCTION

BGI does not contest the fundamental principle that, normally, competitive and willful patent infringement is permanently enjoined especially where the infringer has not yet entered the market. Instead, BGI's opposition hinges on the dubious proposition that the CoolMPS system is somehow better than Illumina's product and that this justifies its infringing launch.   This proposition is contradicted by the record evidence, including from the most authoritative voices at BGI, who testified that CoolMPS is still not even mature enough to be commercialized.

Instead of rebutting Illumina's overwhelming evidence of irreparable harm, BGI points to other competitors in the NGS marketplace.  This is irrelevant.  There is no question that BGI plans to have CoolMPS compete directly with, and will be marketed to displace, Illumina's patented technology. BGI's direct and undeniable plan to compete using Illumina's patented technology warrants a permanent injunction.

In short, BGI fails to rebut Illumina's showing of irreparable harm from potential lost sales due to BGI's infringement.  Instead, BGI devotes much of its opposition brief to relitigating issues that the Court has already rejected or issues that are currently already before the Court, such as whether Illumina obtained the asserted patents inequitably, or whether Illumina misrepresented the prior IPR proceedings to the jury.  There is no record support for BGI's baseless allegations.

Compared to Illumina's extensively documented irreparable harm showing, BGI's showing of harm to it from an injunction is contradicted by the record.  Because the evidence shows BGI does not even believe its CoolMPS product is ready for launch, it does not have a compelling reason to oppose an injunction at all.  The balance of harms strongly tilts to Illumina.

Finally, the scope of the injunction should be as requested in Illumina's motion.  BGI does not challenge the form of the proposed injunction, other than to argue that the injunction should create complex carve-outs for BGI that are a recipe for dispute and market confusion.

## II.    BGI FAILS TO REBUT ILLUMINA'S SHOWING OF IRREPARABLE HARM

### 1.    The Presence of Other Competitors In the NGS Market Is Irrelevant

BGI does not deny that it directly competes with Illumina.  *See Presidio Components, Inc. v. American Technical Ceramics Corp.*, 702 F.3d 1351, 1363 (Fed. Cir. 2012).  Instead, BGI contends

1    that there are other competitors in the NGS marketplace.  *See* Dkt No. 601[1] at 1.  But competition in

2    the NGS marketplace has never been disputed.  *See, e.g.,* Dkt. No. 538 at 259:19-22 ("Q. And you

3    believe that the NGS market, it includes many current, emerging, and wannabe players; right? A. I think

4    the NGS market is an attractive market with lots of -- lots of competition, yes."); *id.* at 280:24-281:1

5    ("Q. Now, there's another -- a number of other competitors in the sequencing field other than Illumina;

6    isn't that right? A: Yes").  The pertinent question, which BGI ignores, is whether the head-to-head

7    competition is based on the infringing use of Illumina's patented azido technology.

8        The record here shows that BGI competes with Illumina by mimicking Illumina's patented azido

9    technology in its CoolMPS system.  *See e.g.*, Dkt. No. 538 at 278:6-9 ("Just as a factual matter, the

10   chemical structure for the three prime azidomethyl structures used by BGI in all its products is the same

11   as what Illumina uses; correct? A. I think, yes.").  As such, BGI's direct competition, irreparably

12   damages Illumina by forcing Illumina to compete against its own patented technology.  *See Douglas*

13   *Dynamics, LLC v. Buyers Prod. Co.*, 717 F.3d 1336, 1345 (Fed. Cir. 2013) ("Where two companies are

14   in competition against one another, the patentee suffers the harm – often irreparable – of being forced

15   to compete against products that incorporate and infringe its own patented inventions.")

16       Moreover, the other market players BGI identifies: PacBio, Oxford Nanopore, and Thermo

17   Fisher, have been in the NGS market for many years, including when the Court issued the preliminary

18   injunction in June 2020.  The presence of other competitors does not negate the irreparable harm to

19   Illumina.

20           **2.      BGI Does Not Meaningfully Dispute Illumina's Proof Of Lost Market Share,
                       Lost Sales And Price Erosion**

21
22       BGI ignores the record and its own contrary admissions in arguing that Illumina "speculates"

     about losing market share, lost sales, and price erosion.
23
24       First, BGI contends that, because Illumina has been successful in developing its market share in

     China, there is no evidence of lost market share.  *See* Dkt. No. 601 at 3.  But Illumina's commercial
25
     success in China (or any other market) is irrelevant to BGI's willful infringement in the US.  *See*
26
     *Douglas Dynamics,* 717 F.3d at 1345 ("[T]his court again disagrees with the district court that [the
27

28   _____
     [1] All citations are to the docket in Case No. 3:19-CV-03770-WHO unless otherwise indicated.

1  patentee] should suffer some penalty for managing through great effort to maintain market share in the

2  face of infringing competition."). The fact that Illumina can compete with BGI in China does not negate

3  the irreparable harm Illumina will suffer from BGI's continued infringement in the US and ignores that

4  BGI wins sales from Illumina in China.

5      BGI concedes that Illumina indeed lost customers as a result of BGI's activities abroad. But

6  BGI nevertheless contends that, based on its limited commercial experience launching in Canada, the

7  number of sales before the patent expiration is "likely to be negligible," and as such, subsequent "lost

8  sales would pale in comparison" to Illumina's revenue. Dkt. No. 601 at 4. This misses the point. BGI's

9  commercial failure is not the barometer to determine whether Illumina will be irreparably harmed.

10 Illumina has established that BGI specifically prices its products to undermine Illumina's market share.

11 *See* Dkt. No. 585-1 ¶ 3; *see* 1465 Dkt. No. 10-4 ¶¶ 47, 52, 68. Illumina also provided specific examples

12 where it has lost sales to BGI, and BGI offers no credible challenge to Illumina's evidence.

13     BGI does not deny causing Illumina to lower its prices in foreign markets, but claims that

14 "potential sales . . . would have little to no impact on Illumina's pricing." This rings hollow considering

15 BGI's contrary representations to this Court. In its antitrust complaint, BGI claimed that "consumers

16 have been deprived of the benefits of competition between Illumina and CGI, which . . . **would force it**

17 **[Illumina] to lower its own prices**.[2]" Case No. 3:21-cv-00217, Dkt. No. 1 ¶ 193; *see also* 00217 Dkt.

18 No. 34 at 6 (Opposing Motion to Stay). There is no reason to believe that the price erosion attendant

19 to BGI's competition with Illumina in foreign markets would not occur in the U.S. Moreover, by

20 claiming that CoolMPS is a cheaper alternative, BGI underscores the price erosion Illumina will likely

21 face. *See* Dkt. No. 601-12 ¶ 37; Dkt. No. 601 at 14, 17 (claiming that CoolMPS is a "[substantially]

22 less expensive technology").

23     Moreover, BGI's KOL and litigation expert, Dr. Smith, admitted that, if BGI is permitted to

24 launch in the US, it would drive down Illumina's prices and allow customers to attempt to extract price

25 concessions from Illumina. *See* Ex. 1 (Smith Depo.) at 145:19-146:2; 65:22-66:7; 164:18-165:2; *see*

26 *also* 1465 Dkt. No. 10-4 ¶¶ 58, 74. Federal Circuit law recognizes that price erosion is a classic form

27 of irreparable harm. *See Celsis in Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922, 930 (Fed. Cir. 2012);

28

---

[2] Emphasis added throughout unless otherwise indicated.

1    *Robert Bosch, LLC v. Pylon Manufacturing, Corp*, 659 F.3d 1142, 1155 (Fed. Cir. 2011).  The price

2    erosion caused by BGI will be even more difficult to quantify given Illumina's consistent track record

3    of driving down sequencing costs through innovation, which Dr. Smith described as a "technological

4    miracle."  Ex. 1 (Smith Depo.) at 97:19-98:18; 203:8-204:7.

5          The irreparable harm to Illumina in the form of loss of market share, lost sales, and price erosion

6    that would occur if BGI is allowed to enter the US market is amply evident in the record.

7                    **3.       BGI Does Not Refute Illumina's Showing of Reputational Harm**

8          BGI ignores Illumina's reputation as the exclusive provider of its patented azido technology.

9    Dkt. No. 601 at 5-6.  But, "marketplace exclusivity itself 'is an intangible asset that is part of the

10   company's reputation'" that must be considered in the irreparable harm analysis.  *Douglas Dynamics.*,

11   717 F. 3d at 1344–45.  BGI cannot credibly deny that its plan to use key opinion leaders to tout the

12   infringing CoolMPS systems over Illumina's competing products would harm Illumina's reputation as

13   the exclusive provider of its patented azido chemistry.  *See* Dkt. No. 137-6 (Van Oene Depo.) at 91:21-

14   93:2; 120:7-121:16; 191:8-200:24; 226:12-16; Ex. 1 (Smith Depo.) at 181:22-182:7 (acknowledging

15   Illumina's reputation is based in part on its azido patents).

16         Instead, without irony, as an adjudged willful infringer, BGI challenges Illumina's claim of

17   reputational harm by stating that "CGI is using the [*Illumina*] patented technology in superior

18   products," and that "[CGI's] products are more prestigious than Illumina's."  *See* Dkt. No. 601 at 5, 6.

19   It is precisely this type of harm—being forced to compete against its own technology, the attendant

20   reputational damage, and customer confusion—that Courts have deemed non-quantifiable and

21   uncompensated by monetary damages.  *See* Dkt. No. 185 (PI Order) at 19; *E.I. DuPont de Nemours*

22   *Company v. Unifrax I LLC*, No. 14–1250–RGA, 2017 WL 4004419, at *5 (September 12, 2017)

23   ("Monetary damages are inadequate to compensate Plaintiff here because Plaintiff would be forced to

24   compete against a rival gaining market share with Plaintiff's technology.")  BGI's claim that CoolMPS

25   is "the best of the commercially acceptable alternatives" to Illumina's on the market, further shows why

26   the market might be confused, and how Illumina's reputation is further eroded.  *See* Dkt. No. 601 at 11.

27         BGI also contends that "Illumina makes no claim that CGI's products are considered "less

28   prestigious and innovative."  *Id.* at 5.  But Dr. Smith, BGI's KOL did testify to exactly that.  *See* Ex. 1

---

(Smith Depo.) at 53:12-18 ████████████████████████████████████████

████████████████████████████ *id.* at 51:20-52:13 (Testifying that the industry lacks comfort in the data quality, robustness, and durability of BGI's systems). In contrast, Dr. Smith lauded Illumina's systems. *See, e.g., id.* at 203:23-204:7 (testifying that Illumina's contributions have been a "technological miracle"). There is no record evidence that BGI's products are innovative or more prestigious and it is false.

> **4.    BGI Does Not Dispute That Illumina Has Not Licensed Its Core Sequencing Technology**

BGI does not meaningfully challenge that Illumina's ability to exclude others from making and offering to sell products that incorporate the patented azido protecting group, gives it a competitive advantage. *See* Dkt. No. 578 at 7. Nor does BGI rebut the notion that this "intangible asset" is part of Illumina's reputation. *See id.* Instead, BGI cites to distinguishable cases, where there was no causal nexus between the harm and the infringing feature. As shown below, the causal nexus is manifest here.

> **5.    There Is A Direct Causal Nexus Between BGI's Infringement And Illumina's Irreparable Harm**

BGI's argument on "causal nexus" cannot be reconciled with the evidence. BGI claims that "the commercial success of [Illumina's] products cannot be tied to the patented features." *See* Dkt. No. 601 at 6-7. Wrong. This Court already found that "the driving feature of sales of sequencers is the ability to accurately sequence DNA." *See* 1465 Dkt. 75-10 at 54:22-55:10.

And Dr. Smith admitted that the patented azido chemistry is "indispensable" to the quality of sequencing, including stability, accuracy, and read lengths. *See* Ex. 1 (Smith Depo) at 175:3-6; 27:9-16; 110:10-14; 111:17-119:1 (using Illumina's patented azido chemistry builds customer confidence); 23:11-24 (important advance); *see also* Ex. 3 (S. Drmanac Depo.) at 78:2-9 (testifying that azidomethyl was more stable and the best for longer read lengths); Romesberg Opening Expert Report ¶ 46 ("Illumina's method based on using 3'-O-azidomethyl dNTPs is the only approach shown to meet all of the stringent requirements for this SBS process using reversible terminators sufficiently for commercially viable DNA sequencing, and is a critical component for achieving the performance needed for a commercially viable SBS system. That is, use of the ***azidomethyl blocking group is necessary to have a commercially feasible SBS*** product that uses reversible chain terminators"). Dr.

1    Smith also testified that the blocking group was the feature that was specifically copied in Qiagen's

2    infringing systems.  *See* Ex. 1 (Smith Depo.) at 26:5-21.

3         Dr. Smith admitted the patented azido blocking group is an important driver of Illumina's

4    commercial success.  *Id.* at 176:7-14; 178:10-22; 201:23-202:6; 203:23-204:7 (technological miracle).

5    Without the use of Illumina's patented azido chemistry, BGI's products would be unable to perform

6    high-accuracy sequencing because the azidomethyl blocking group is what allows nucleotides to be

7    incorporated and detected in a controlled manner during sequencing.  1465 Dkt. No. 13 ¶ 31.  BGI's

8    own witnesses have admitted that the azido chemistry is the key inventive feature in all of the asserted

9    claims.  *See* Ex. 4 (Sutherland Depo.) at 114:9-13; 239:9-14; Dkt. No. 539 at 326:6-25 (testifying that

10   the azido blocking group was the "best chemistry"); Dkt. No. 540 at 741:1-11 (agreeing that "Illumina's

11   azido patent, [was the] best chemistry").  BGI's contention that CoolMPS "incorporate[s] multiple

12   different, superior features" is irrelevant, and unsupported by the record.  *See* Dkt. No. 185 at 19 ("I am

13   not persuaded by BGI's arguments that features other than those covered by Illumina's patents are the

14   driving factor in sales of its products.").

15        Moreover, BGI's inability to find a commercially viable alternative further establishes the

16   essentiality of the azido technology—even after decades of research, no one had discovered a non-azido

17   protecting group that is commercially viable for an SBS system.  *See* Dkt. No. 539 at 485:21-487:7; *id.*

18   at 462:16-20.  In fact, numerous groups have also failed in that effort.  *See* PDX7.520; Dkt. No. 539 at

19   485:21-487:7; *id.* at 462:16-20; TX1552.  Illumina has amply shown that there is more than "some

20   connection" that the demand for sequencers is closely related to demand for the patented azido

21   technology.  *See Apple Inc. v. Samsung Elecs. Co., Ltd.,* 809 F.3d 633, 640 (Fed. Cir. 2015).

22        Relying on Dr. Barnes' testimony about earlier experiments in the development cycle, BGI

23   characterizes Illumina's sequencing platform as a "total failure" and argues that the azidomethyl was

24   "relative[ly] unimportan[t]."  These frivolous arguments, however, are contrary to the record evidence,

25   including from BGI's own scientists.  *See, e.g.*, Dkt. No. 539 at 326:6-25 (testifying that the azido

26   blocking group was the "best chemistry"); Dkt. No. 540 at 741:1-11 (agreeing that "Illumina's azido

27   patent, [was the] best chemistry"); Dkt. No. 539 at 459:15-19 ("The question was (as read):

28   "QUESTION: Do you agree with Dr. Smith that the azido blocking group is a component of the success

of the various successful Illumina sequencing platforms?" And your answer was: "Yes."). Remarkably, if BGI truly believed that the azidomethyl is "relative[ly] unimportan[t]," then BGI could easily use a different blocking group, instead of insisting on the infringing azido blocking group, as BGI does in its opposition. *See* Dkt. No. 601 at 7, 8.

BGI's second argument that CoolMPS offers advantages over Illumina's sequencers beyond the accused features merely rehashes arguments which this Court already rejected. *See* Dkt. No. 185 at 18. It is all too clear that Illumina's irreparable harm is causally related to BGI's infringement.

## III.    MONETARY DAMAGES ARE INADEQUATE TO COMPENSATE ILLUMINA

BGI's argument that any harm suffered by Illumina would be "quantifiable" ignores established Federal Circuit precedent recognizing that the harms at issue are irreparable and defy monetary compensation. *See, e.g., Celsis in Vitro, Inc.*, 664 F.3d at 930 ("Price erosion, loss of goodwill, damage to reputation, and loss of business opportunities are all valid grounds for finding irreparable harm."). As Illumina explained, BGI's infringement would cause lost sales and loss of market share, price erosion, as well as damage to customer relationships and goodwill. Dkt. No. 578 at 3-7; *see also* 1465 Dkt. No. 10-4 ¶¶ 52-77. BGI's contention that these harms are quantifiable is simply wrong.

First, Dr. Kearl's declaration depends on the false notion that "CoolMPS technology is superior." *See* Dkt. No. 601-7 ¶ 18 (citing Metzker Decl. ¶¶ 8-35). There is simply no credible evidence in the record to support this statement. Moreover, as already explained, this claim is wholly contradicted by the sworn (unrebutted) testimony of BGI's highest ranking officials. *See* Dkt. No. 538 (Trial Tr.) 272 at 20 (Jian Wang testifying that CoolMPS is not mature); *see* Dkt. No. 525-5 at 19:3-10 (same); *id.* 37:10-14 (same); *id.* 85:11-13; Dkt. No. 539 at 492:14-17 (R. Drmanac confirming that CoolMPS is not mature); Ex. 5 (Bao Depo.) at 22:1-7 ██████████████████████████████ ████████████████████ Dkt. No. 539 at 326:6-25 (C. Xu testifying that he believed that the azido blocking group was the "best chemistry").

Furthermore, despite having "detailed" multi-year sales data from Illumina (*see* Dkt. No. 601-7 ¶ 16), Dr. Kearl makes no attempt to actually estimate the lost sales due to BGI's entry into any market where BGI competes with Illumina. Nor does he attempt to estimate a going-forward royalty. Instead, he vaguely and unhelpfully asserts that there is "no reason that a going-forward reasonable royalty could

not be determined with reasonable precision." *See* Dkt. No. 601-7 at ¶ 17.

Moreover, Dr. Kearl ignored the impact of KOLs in his analysis. *See* Dkt. No. 542 at 995:5-14 ("Q. And you didn't do anything to try to quantify them [KOL relationships]; right? A. No."). Nor does his declaration explain how the harms to Illumina's KOL relationships can be quantified.

## IV.   BGI FAILS TO REBUT ILLUMINA'S SHOWING THAT THE BALANCE OF HARMS FAVORS AN INJUNCTION

BGI's argument that the burden of a permanent injunction is "especially high given the limited amount of time remaining" before the patents expire is meritless. Dkt. No. 601 at 11. "Patent rights are no less valid or enforceable if there is one day or one year or the entire term left in the life of the patent." *RMH Tech, LLC v. PMC Indus.*, 352 F. Supp. 3d 164, 203 (D. Conn. Dec. 18, 2018) (citing *Atlas Powder Co. v. Ireco Chems.*, 773 F.2d 1230, 1234 (Fed. Cir. 1985) ("The fact that the patent has only one year to run is not a factor in favor of [the infringer] in the balance of equities")). Preventing BGI from infringement for "less than six months" does not impose an unfair burden.

In any event, BGI's claim of harm is contradicted by Chairman Wang, who testified that CoolMPS is not ready for the market. Dkt. No. 538 (Trial Tr.) 272 at 20; *see* Dkt. No. 525-5 at 19:3-10 (testifying the CoolMPS is not mature); *id.* 37:10-14 (same); *id.* 55:2-8 (same); Dkt. No. 539 at 492:14-17 (R. Drmanac confirming that CoolMPS is not mature).

Chairman Wang also testified that CoolMPS is not essential to BGI's business. *See* Dkt. No. 525-5 at 83:17-18, 83:23-84:4 ("MR. REINES: Q: **Do you consider the CoolMPS sequencers to be an important product line of BGI**? THE WITNESS: **No.** Even after so many years, we have not seen it. In addition, without the -- these lines, we still live rather well.· Therefore, it is not at a very important place for me. It's just our R&D people thought how – how good it -- it is. I said, It doesn't matter what you say about how good it is. Show it to me."). He also testified that the US market is not central to BGI's commercial success. *See id.* at 61:5-14 ("Q: Did they report to you that the patent office rejection of BGI's challenge to the azido patents would be a hit to the U.S. business of BGI? THE WITNESS: As a matter of fact, at that time, that is in March of 2018. The U.S. government had already listed us in their 301 list. Therefore, at the time -- at that time, **the U.S. business, to me, was no longer a very -- a most important business direction**"); *see also* Ex. 6 (Wang Depo) at 64:3-6

1 ███████████████████████████████████████████████████████████

2 ████████████████ Dkt. No. 525-5 at 65:21-66:1 ("And my response was two -- I had two responses. First

3 of all, the **United States was not the only market**. And secondly, that if it's possible to do it somewhere

4 on the perimeter of the United States or outside of the perimeter of the United States, that's -- that would

5 be okay, too."); Ex. 6 (Wang Depo) at 66:16-20████████████████████████████

6 ████████████████████████████████████████████████████████████

7 ██████████████████████████████ Dkt. No. 525-5 at 33:19-23

8 ("Therefore, as to the selling of the instruments in the United States, as I said, **if we were prevented**

9 **from selling, we could still live rather well**.  And we also had such a big thing in China which needed

10 our attention.").  In light of Chairman Wang's testimony, which BGI does not even attempt to recant,

11 BGI will not be harmed by a permanent injunction barring release of the CoolMPS products into the

12 U.S.

13 Finally, as noted in Illumina's opening brief, BGI lacks credibility in its representations to this

14 Court about the impact of an injunction.  For example, instead of addressing the contradictions in the

15 substance of Dr. Sophie Liu's testimony, that there have been no announced job losses due to the

16 preliminary injunction, BGI challenges Dr. Liu's knowledge, casting her as just a "business

17 development employee without human resources oversight."  Dkt. No. 601 at 12.

18 Instead, BGI credits Dr. Drmanac's testimony.  *See id.*  But the preliminary injunction issued

19 on June 13, 2020 (*see* Dkt. No. 185), whereas the layoffs Dr. Drmanac was discussing happened five-

20 months prior, in January 2020.  *See* Ex. 7 (R. Drmanac Depo, Ex. 1002); Ex. 2 (R. Drmanac Depo.) at

21 582:20-25.  These layoffs predated and were completely unrelated to the preliminary injunction.  In

22 fact, Dr. Drmanac admitted as much, offering several reasons for the layoffs.  *See id.* (testifying that the

23 layoffs were routine); *id.* at 583:6-12 (the layoffs were due to budgetary constraints); *id.* at 583:13-16

24 (the layoffs were unrelated to Illumina).  This disingenuous attempt to cast layoffs that happened five

25 months before the preliminary injunction further undermines BGI's credibility regarding any claims of

26 harm if a permanent injunction is granted.

27 **V.     THE PUBLIC INTEREST IS BEST SERVED BY A PERMANENT INJUNCTION**

28 BGI does not address the Federal Circuit's *Rite-Hite* decision that explained that it is the "rare"

case where an injunction would so affect the public health adversely that it justifies denial of a permanent injunction. *Rite-Hite Corp. v. Kelly Co.*, 56 F.3d 1538, 1547 (Fed. Cir. 1995).

The thrust of BGI's public interest argument is that (1) CoolMPS is "more accurate than Illumina" (Dkt. No. 601 at 15); (2) CoolMPS is "substantially less expensive" than Illumina systems (*id.* at 17); (3) CoolMPS "would advance the public good by advancing the health and welfare of society." Dkt. No. 601 at 14-17.

First, BGI's claim that CoolMPS is "more accurate" is clearly contradicted by the record. BGI's most authoritative voices, including Chairman Jian Wang, testified that the CoolMPS is unproven and not ready for market. *See* Dkt. No. 538 (Trial Tr.) 272 at 20; *see* Dkt. No. 525-5 at 19:3-10 ("A: I was aware of this technology of his [CoolMPS], but at the time, it was ***not a mature*** one, so – and eventually, how he was talking about it, I do not know the details. And that technology ***even now is still not mature***."); *id.* 37:10-14 ("Q: Is the CoolNGS technology mature today? A: ***We still have not really used it ourselves***."); *id.* 55:2-8 ("After the refusal by the U.S. Patent Office regarding our challenge, it was impossible for us to forcibly push this product. I also did not approve the sales of CoolNGS in the U.S. My encouragement and support to them was to complete the research and development of this product and sell it when it is mature and non-infringing."); *id.* at 85:11-13; *id.* at 85:20-23 ("Can you answer any more directly about whether or not CoolMPS technology is mature enough to be for markets than you have so far? A: We are using it internally. However, we do not have any plan to commercialize it right now."); Dkt. No. 539 at 492:14-17 (R. Drmanac confirming that CoolMPS is not mature); Ex. 5 (Bao Depo.) at 22:1-7 (███████████████████████████████████████). It is simply inconceivable that an unproven and immature system is "more accurate" than Illumina's industry leading systems.

Regardless, in its opposition, BGI merely repackages the same failed arguments it made at the preliminary injunction proceedings. *See* Dkt. No. 119-4 at 29 ("Because Defendants' sequencing products are very different than Illumina's—they use PCR-free amplification, unlabeled nucleotides, antibody detection methods, and unique instruments and analysis software, among other differences—they provide an important alternative approach to genomic analysis")(citing Smith and Rogers Declarations). The Court already rejected these arguments. *See* Dkt. No. 185 at 19 ("I am not persuaded

by BGI's arguments that features other than those covered by Illumina's patents are the driving factor in sales of its products.").

With regards to price, the Federal Circuit has long recognized that price undercutting by infringers does not benefit the public interest. *See, e.g., Douglas Dynamics*, 717 F.3d at 1345-1346. Infringers "will often find it easier to avoid the costs and risks of research and development and just 'compete' by infringement." *Id.*

As noted in BGI's opposition, "consumers . . .only care about the quality of the sequence produced by the instrument." *See* Dkt. No. 601 at 8. BGI's claim of advancing the public good is undermined by its KOL, Dr. Smith, who testified that the industry has no confidence in the data from BGI's CoolMPS products. *See* Smith Depo. at 51:24-52:3 ("Q: Does the sequencing history [industry] have comfort in the quality of the data on the BGI systems? THE WITNESS: *No, they do not*. Q. BY MR. REINES: And that's both through the standard and the CoolMPS? A. *That is indeed the case*."); *id.* at 52:7-10, 13 ("Q. Does the sequencing industry have comfort that the BGI systems are sufficiently robust and durable to be worthy of buying? . . . 13 THE WITNESS: *No, they do not*."); Ex. 1 (Smith Depo.) at 53:11-18 ████████████████████████████████████████████████ BGI's reliance on the Zhang study does nothing to contradict the record evidence.[3] The fact that a permanent injunction will have an impact on customers does not make an injunction improper—the Court's task is to "strike[] a workable balance between protecting the patentee's rights and protecting the public from the injunction's adverse effects." *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 863 (Fed. Cir. 2010). This is not the "rare case" where the public interest supports denial of a permanent injunction.

Illumina continues to advance the public interest by reducing the cost of gene sequencing, and

---

[3] Contrary to BGI's suggestion, the Zhang study did not evaluate multiple sequencing platforms. The aim of the study was "to sequence DNA extracted from [specific] cells . . . to build a de novo assembly of eight genomic regions encoding four key components of the immune system." *See* Zhang study [Abstract]. The narrow focus of the study, unrelated to comparing sequencing platforms, explains why the "comparison" involved different read lengths (which affects accuracy), and the paper does not discuss any differences between the BGI and Illumina platforms. Instead, the supposed "results" on which BGI relies are buried in a **supplemental** figure. *See* Dkt. No. 106 at 15; Dkt. 601-13 Metzker Dec. Ex. 1 (Supplemental Figure 9).

1   has done so at a pace far faster than predicted by Moore's Law.  Dkt. No. 538 at 235:19-237:2 (Tousi

2   testifying about Illumina's R&D investments and Flatley's Law).  BGI cannot deny that Illumina's

3   continued investment in its sequencing technology has significantly driven down the cost of sequencing

4   a human genome.  *Id.*; 1465 Dkt. No. 10-4 ¶¶ 11-12, 20.

5   **VI.   BGI'S UNCLEAN HANDS ARGUMENT IS MERITLESS**

6          BGI's unclean hands argument is nothing more than a fifth attempt to inject its unsupported

7   inequitable conduct theory, which this Court already rejected.  *See* 1465 Dkt. No. 263 at 6, 8 (in granting

8   BGI leave to amend to add inequitable conduct, this Court recognized that there were "weaknesses to

9   BGI's proposed defense"); Dkt. No. 424 at 24-25 (granting Illumina's motion for summary judgment

10  on BGI's inequitable conduct defense); *see also* Case No. 3:21-cv-00217, Dkt. No. 34 at 2 (asserting

11  that Illumina's patents were obtained by fraud on the patent office).  BGI's regurgitating of its failed

12  arguments does not negate Illumina's proof of irreparable harm, or the need for a permanent injunction.

13         **A.      Illumina Did Not Mischaracterize the Prior Proceedings**

14         As fully detailed in its opposition to BGI's motion for a new trial (*see* Dkt. No. 599 at 2-8; 11),

15  and incorporated by reference here, Illumina did not suggest that the Qiagen proceedings and BGI's

16  IPR challenges were directed to more than one Patent.  Illumina made clear that the Qiagen proceedings

17  and BGI's IPRs were directed to the '537 Patent in its opening presentation, during examination of Dr.

18  Drmanac, and at closing.

19         BGI also contends that "previous decisions that relied on arguments about incomplete cleavage

20  were actually wrong as the reference was discussing yield after purification and not cleavage."  BGI

21  made this same argument in the first IPR on the 537 Patent, which the Board soundly rejected.  *See*

22  TX0985.  BGI presented the same arguments at trial, which the jury rejected.  *See eg.*, Trial Tr. at

23  576:11-592:19.

24         BGI cherry picks citations to Dr. Romesberg's testimony, to claim that he testified that "Parce

25  did not disclose removing the blocking group with TCEP."  Dkt. No. 601 at 19 (citing Dkt. No. 542 at

26  1108:3-7).  This is just facially wrong as is evident from the preceding question and answer.  *See* Dkt.

27  No. 542 at 1107:18-1108:2 ("Q. So Parce actually says you can remove the blocking group with TCEP?

28  A. In this case, we are defining 'blocking group' a very specific way; and all I can tell you is that the

way we are discussing it here, ***Parce is not doing that***. If you read his specifications, he describes it in some vague language. ***But the TCEP step leaves the phosphate***. **So in every way that we're discussing things here, that blocking group remains**.")

### B.   Illumina Did Not Mischaracterize the '973 Disclosure

BGI argues that Illumina's use of a demonstrative with Dr. Balasubramanian's testimony constitutes unclean hands because Illumina "presented … in a way that claimed he thought of using unlabeled nucleotides at the time of the claimed invention."  *See* Dkt. No. 601 at 21.  Illumina has addressed this meritless argument in its opposition to BGI's motion for new trial, and incorporates its response here.  *See* Dkt. No. 599 at 7-8.

## VII.   THE SCOPE OF THE PROPOSED INJUNCTION IS PROPER

BGI argues that any injunction should include carve-outs to allow BGI to perform various acts, including (1) offering the Accused Products for sale where such sales will occur after the expiration of the patents in suit, and should allow BGI to immediately commence promoting, advertising, and marketing the Accused Products for sale after the patents expire, and (2) infringing "R&D activities" in the US, because the jury's verdict supposedly accounts for an R&D license though the expiration of the patents.  Dkt. No. 601 at 21-22.

These activities are inherently commercial and would cause irreparable harm.  *See* 1465 Dkt. No. 1465 10-4 at ¶¶ 54, 61-62, 67-68.  The Federal Circuit law is clear, "[o]ne of the purposes of adding "offer[ ] to sell" to § 271(a) was to prevent exactly the type of activity [the Defendant] has engaged in, *i.e.*, generating interest in a potential infringing product to the commercial detriment of the rightful patentee."  *3D Sys., Inc. v. Aarotech Lab'ys, Inc.*, 160 F.3d 1373, 1379 (Fed. Cir. 1998).  This is precisely what BGI is attempting to accomplish—curry industry interest to Illumina's detriment.

First, allowing BGI to promote its infringing products during the life of the patents is a recipe for market confusion and legal dispute.  Enforcement would be difficult.  Policing BGI's promotional activities to confirm that sales would be consummated only after the expiration of the patents-in-suit[4]

---

[4] As detailed in Illumina's renewed JMOL motion, and incorporated by reference here, BGI failed to meet its burden to prove that Claim 3 of U.S. Patent No. 7,541,444 was invalid as obvious under § 103. *See* Dkt. No. 579 (Illumina's Renewed JMOL motion), pp. 13-23.  As such, Illumina believes that the '444 Patent remains valid.

1   is impractical and invites wasteful dispute.  *See, e.g.*, *J&M Indus., Inc. v. Raven Indus., Inc.*, No. 16-

2   2723-JWB, 2021 WL 5769360, at *11 (D. Kan. Dec. 6, 2021) ("[I]n light of the impracticality of further

3   tailoring the injunction to exempt non-infringing uses – the court concludes it is appropriate to enjoin

4   Raven from engaging in all sales of Fortress products"); *Skydive Arizona, Inc. v. Quattrocchi*, 673 F.3d

5   1105, 1116 (9th Cir. 2012) (quoting *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 193 (1949))

6   (Injunctions should also not be "so narrow as to invite easy evasion").  Even when faced with direct

7   inquiries from Illumina, BGI has routinely concealed its infringing use of Illumina's technology.  *See,*

8   *e.g.*, TX0696 (Letter from Illumina asking about BGI's use of SBS in the Zebra platform), *Id.* (Zhang

9   email advising BGI to obfuscate the use of SBS).  BGI has also failed to keep accurate records of its

10  infringing use of Illumina's patented technology.  *See e.g.*, JTX 082 (CGI's incomplete financial records

11  from 2014-2015); *see also* Dkt. No. 608-11 at 3-4.

12          If the Court were nevertheless to permit BGI to promote its infringing products before expiration

13  every such promotion should include a conspicuous written disclaimer that the infringing products

14  cannot be sold or used before the patents expire.  *See, e.g.*, *Asetek Danmark v. CMI USA, Inc.*, No. 13-

15  cv-00457-JST, 2016 WL 31674 (N.D. Ca. Jan. 4, 2016) (granting a permanent injunction that required

16  infringers to include "a copy of [the] Order and the written notice ... with every bill of sale for the

17  Infringing Products and in the boxes in which the Infringing Products are shipped or sold, regardless of

18  where they are sold").  To wit, the disclaimer should state: "BGI's StandardMPS and CoolMPS

19  sequencing products have been found to infringe Illumina's patent rights in the United States in *Illumina*

20  *Inc. et al v. BGI Genomics Co., Ltd. et al*, Case No. 3:20-cv-01465-WHO.  The use, transfer or sale of

21  those products before the expiration of the relevant Illumina patents is prohibited by a permanent

22  injunction that can be found at [include a link to the permanent injunction]."

23          Furthermore, a carve-out for "R&D activities" supposedly because "$8 million award [] is

24  sufficient for an R&D license through the life of the asserted patents" makes no sense.  The jury

25  instructions and the verdict form specifically note that the damages award are to compensate for BGI's

26  infringement from early 2014 to June 2020.  *See* Dkt. No. 522 ¶  24 ("What sum of money, if any,

27  would fairly and reasonably compensate Illumina for Defendants' infringement from early 2014

28  through June 2020?"); *see* Dkt. No. 542 at 552:16-21 ("THE COURT: Yeah, yeah. And so here's what

I'm planning to do with respect to the verdict form on the findings of damages. I think I'm just going – I'm going to take out past and I'm going to conclude that question with 'from early 2014 to June 2020,' which is what you all had agreed on as the period of damages."); Dkt. No. 521 at 36 ("if you decide that Illumina is entitled to damages, the time period for the damages that may be awarded by you commences in early 2014 and ends in June 2020.")  As such, the injunction should not include loopholes for BGI to advance its commercial interests via continued willful infringement.

## VIII.   CONCLUSION

For the above reasons, the Court should grant Illumina's Motion for Permanent Injunction.

Date:  February 16, 2022

Respectfully submitted,

_/s/ Edward R. Reines_

EDWARD R. REINES (Bar No. 135960)
DEREK C. WALTER (Bar No. 246322)
NATE NGEREBARA (Bar No. 317373)
MELINDA ROOT (Bar No. 334485)
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065
Tel: (650) 802-3000
Fax: (650) 802-3100
edward.reines@weil.com
derek.walter@weil.com
nate.ngerebara@weil.com
melinda.root@weil.com

ANDREW P. GESIOR (*pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
andrew.gesior@weil.com

AUDRA SAWYER (Bar No. 324684)
WEIL, GOTSHAL & MANGES LLP
2001 M Street NW, Suite 600
Washington, DC 20036
Telephone: (202) 682-7274
audra.sawyer@weil.com

*Attorneys for Plaintiffs*
ILLUMINA, INC. AND ILLUMINA
CAMBRIDGE LTD.